No. 23-2421

---

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

JAMES HARRIS,
Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:11-CR-00667
The Honorable Judge John J. Tharp

---

BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, JAMES HARRIS

---

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:   217-373-0666
Fax:         217-373-0667
Email:  Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JAMES HARRIS

---

**ORAL ARGUMENT REQUESTED**

---

## Circuit Rule 26.1 Disclosure Statement

Appellate Court No: 23-2421
Short Caption: United States v. Harris

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case:

**James Harris**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Federal Public Defender's Office for the Central District of Illinois; and Law Offices of James A. Graham**

(3)    If the party or amicus is a corporation: N/A
    i)    Identify all its parent corporations, if any; and

**N/A**

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A**

(4)    Provide the information required by FRAP 26.1(b) - Organizational Victims in Criminal Cases:

**N/A**

(5)    Provide Debtor information required by FRAP 26.1(c)1 & 2:

**N/A**

Attorney's Signature: **/s/ Michael Will Roy**            Date: **January 10, 2024**

Attorney's Printed Name:  Michael Will Roy

Please indicate if you are *Counsel of Record* for the        ☒ **Yes**
above listed parties under Circuit Rule 3(d).           ☐ No

Address:   Federal Public Defender        Phone Number:   (217) 373-0666
        300 West Main Street        Fax Number:      (217) 373-0667
        Urbana, Illinois 61801        Email:           Michael_Roy@fd.org

# Table of Contents

Circuit Rule 26.1 Disclosure Statement ........................................................................ ii

Table of Authorities .......................................................................................................... v

Jurisdictional Statement .................................................................................................. 1

Issues Presented for Review ........................................................................................... 2

Statement of the Case ...................................................................................................... 3

    I.    Jury acquittal on Illinois gun-possession charges ................................... 3

    II.    Release status pending federal revocation proceedings .......................... 4

    III.    Pre-revocation motions ............................................................................. 5

    IV.    Evidentiary Hearing ................................................................................... 7

        A.    Salvation Army conduct ............................................................. 7

        B.    Alleged gun possession ............................................................... 8

        C.    Prison fight ................................................................................ 10

    V.    The district court's ruling ...................................................................... 10

Summary of Argument .................................................................................................. 14

Argument ........................................................................................................................ 15

    I.    The district court lacked jurisdiction to consider the alleged
        violations at Salvation Army because Harris's supervision had
        already expired. ....................................................................................... 15

        A.    Standard of review .................................................................... 15

        B.    Federal supervision is tolled only by imprisonment "in
            connection with a conviction." ............................................... 15

        C.    Harris's supervision ended before the district court held a
            revocation hearing or issued a summons related to the
            Salvation Army allegations. ....................................................... 16

II.    Harris did not knowingly and voluntarily admit to the Salvation Army conduct.............................................................................. 20

       A.    Standard of review..................................................... 20

       B.    Any admission to an alleged violation of revocation must be knowing and voluntary. ............................................. 21

       C.    Contrary to the district court's findings, Harris did not admit to any violation. ......................................................... 22

III.   The district court relied on inaccurate information to find that Harris knowingly possessed a firearm............................................. 23

       A.    Standard of review..................................................... 23

       B.    Harris had a right to be sentenced according to accurate information............................................................... 23

       C.    The district court misconstrued an attorney's closing arguments during Harris's state trial as Harris's own statements. ............................................................... 24

Conclusion...................................................................................... 28

Certificate of compliance with Fed. R. App. P. 32(a)(7)(B) ............................................. 29

# Table of Authorities

## Cases

*Adkins v. VIM Recycling, Inc.*, 644 F.3d 483 (7th Cir. 2011) .................................................17

*Barney v. Prisoner Rev. Bd.*, 184 Ill. 2d 428, 704 N.E.2d 350 (1998).................................. 18

*Gutierrez v. Schomig*, 233 F.3d 490 (7th Cir. 2000) ........................................................ 19

*Johnson v. United States*, 529 U.S. 694 (2000) .................................................... 18

*Mont v. United States,* 139 S. Ct. 1826 (2019) .......................................................15

*Round v. Lamb*, 2017 IL 122271 ....................................................................17

*U.S. ex rel. Welch v. Lane*, 738 F.2d 863 (7th Cir. 1984) ............................................. 23, 24

*United States v. Barnes*, 907 F.2d 693 (7th Cir. 1990)........................................................ 23

*United States v. Block*, 927 F.3d 978 (7th Cir. 2019) ..................................................... passim

*United States v. Boultinghouse*, 784 F.3d 1163 (7th Cir. 2015) ........................................... 21

*United States v. Buncich*, 20 F.4th 1167 (7th Cir. 2021) ................................................... 19

*United States v. Castaneda*, 77 F.4th 611 (7th Cir. 2023) ................................................. 20

*United States v. Cole*, 567 F.3d 110 (3d Cir. 2009) ............................................................ 16

*United States v. Helding*, 948 F.3d 864 (7th Cir. 2020) .................................................... 23

*United States v. LeBlanc*, 175 F.3d 511 (7th Cir. 1999) .................................................21, 23

*United States v. Lee*, 77 F.4th 565 (7th Cir. 2023).......................................................... 20

*United States v. Miller*, 900 F.3d 509 (7th Cir. 2018) .....................................23, 24, 25, 26

*United States v. Mosley*, 759 F.3d 664 (7th Cir. 2014) ..................................................... 20

*United States v. Nelson*, 931 F.3d 588 (7th Cir. 2019) ...................................................... 21

*United States v. Oliver*, 873 F.3d 601 (7th Cir. 2017) ....................................................... 23

*United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015) ...................................................17

*United States v. Tucker*, 404 U.S. 443 (1972) ............................................... 23, 24

*United States v. White*, 868 F.3d 598 (7th Cir. 2017) ....................................... 24

## Statutes

18 U.S.C. § 2 ........................................................................................................ 1

18 U.S.C. § 922(g) ........................................................................................... 1, 19

18 U.S.C. § 3231 .................................................................................................. 1

18 U.S.C. § 3583(i) .......................................................................................... 6, 16

18 U.S.C. § 3624(e) .................................................................................... passim

18 U.S.C. § 3742 .................................................................................................. 1

21 U.S.C. § 841(a)(1) .......................................................................................... 1

21 U.S.C. § 843(b) ............................................................................................... 1

21 U.S.C. § 846 .................................................................................................... 1

28 U.S.C. § 1291 ................................................................................................. 1

720 ILCS 5/241.1 ................................................................................................ 3

730 ILCS 5/3-3-3 ............................................................................................... 17

## Other Authorities

Fed. R. App. P. 4(b) ............................................................................................ 1

Fed. R. Evid. 201 ............................................................................................... 17

U.S.S.G. § 7B1.1(b) ...................................................................................... 12, 19

U.S.S.G. § 7B1.4 .......................................................................................... 12, 26

## Jurisdictional Statement[1]

The jurisdiction of the United States District Court for the Northern District of Illinois was founded upon 18 U.S.C. § 3231. A grand jury sitting in the aforementioned district charged James Harris by indictment with conspiracy to possess with intent to distribute heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846, and three counts of use of a communication facility to commit a felony, in violation of 21 U.S.C. § 843(b). (R. 21.) The government amended the charges by superseding information to one count of conspiracy to possess with intent to distribute heroin, 21 U.S.C. §§ 841(a)(1) and 846, and one count of possessing a firearm as a felon, 18 U.S.C. § 922(g)(1). (R. 192.) Harris pleaded guilty to both charges. (R. 195.) Following a term of imprisonment, Harris commenced supervised release on July 25, 2016. (R. 483 at 3.) The district court revoked Harris's supervised release on May 11, 2018. (R. 467.) Following another term of imprisonment, Harris again commenced supervised release around March 25, 2020. (R. 483 at 4.) The district court again revoked Harris's supervised release on July 14, 2023 (R. 594), and Harris appealed that revocation judgment (R. 599.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court imposed sentence upon revocation on July 14, 2023, and entered a revocation judgment on July 17, 2023. Harris filed a timely notice of appeal on July 21, 2023. (R. 599); Fed. R. App. P. 4(b)(1)(A)(i).

---

[1] The following abbreviations are used herein: record on appeal: "R.___ at ___;" appendix: "App. at ___;" and July 12, 2023 revocation evidentiary hearing transcript: "Evid. Tr. at ____."

**Issues Presented for Review**

I.      Does an Illinois order of detention for revocation of mandatory supervised release toll a term of federal supervised release under 18 U.S.C. § 3624(e)?

II.     Did the district court err by accepting trial counsel's admission to a violation of supervised release, when counsel's statements were equivocal and Harris himself voiced disagreement with trial counsel?

III.    Did the district court err when it incorrectly cited an attorney's closing arguments during a prior state trial as Harris's personal statements, and then relied on those statements as evidence that Harris was inconsistent and not credible?

## Statement of the Case

James Harris started his current term of supervised release around March 25,
2020. (R. 483 at 4.) About five months later, he was arrested for illegal gun possession
under state law. (R. 473 at 4.) Chicago police alleged that they had been called out on
reports of a man with a firearm. (R. 473 at 7.) When police arrived, Harris placed a brown
purse on a table and ran away. (R. 473 at 7.) Police found a firearm in the bag. (R. 473 at
7.) This gun triggered proceedings in both federal court and state court.

## I.     Jury acquittal on Illinois gun-possession charges

Federal revocation proceedings were continued while Harris fought his new
charges in state court. Illinois prosecutors sought to convict him as a felon in possession
of a firearm, 720 ILCS 5/241.1(a). *See People v. Harris*, 21CR13123-01 (Ill. Cir. Ct. Cook
County). But Harris claimed—correctly it turned out—that neither the purse nor the gun
inside it were his. (Evid. Tr. at 20.) Instead, he had been returning the purse to a woman
he knew, LaDonna Crawford; he claimed to have had no knowledge of the gun inside.
(Evid. Tr. at 20; Gov't Ex. A-1 at 52–79.)

The case proceeded to trial. (Gov't Ex. A-1.) The State relied on testimony from
one of the officers who arrested Harris. (Gov't Ex. A-1 at 13–44.) Harris, on the other
hand, called Crawford—the gun's owner—to testify on his behalf. (Gov't Ex. A-1 at 52–
79.) She explained that she legally possessed the gun pursuant to a state license. (Gov't
Ex. A-1 at 56.) Another friend had accidentally taken Crawford's purse when unloading
groceries from Crawford's car. (Gov't Ex. A-1 at 70.) That friend gave Harris the purse to

3

return to Crawford, and Harris was holding the purse when police arrived. (Gov't Ex. A-1 at 64–66.)

At closing, both sides focused on whether Harris knew that the gun was inside Crawford's purse. (Gov't Ex. A-1 at 103–06, 109–110.) To explain why Harris ran from police, Harris's attorney argued that Harris had an active arrest warrant at that time. (Gov't Ex. A-1 at 111.) The jury seemingly accepted this explanation, as well as Crawford's testimony that she was the sole owner of the gun, and acquitted Harris. (Gov't Ex. A-1 at 135.)

## II. Release status pending federal revocation proceedings

Meanwhile, while the state trial was pending, Harris bounced around different forms of detention, supervision, and home confinement. (R. 485; R. 568 at 3–5.)

First, following Harris's arrest, the district court issued a warrant based on Harris's illegal possession of a gun. (R. 475.) But Harris instead ended up in the Illinois Department of Corrections for what the parties identified as a state "parole" revocation. (R. 485.) State court documents show that, rather than parole, Harris was actually on "mandatory supervised release" (a state analogue for federal supervised release) at the time of his arrest for the gun charge. (App. at 51.) Harris spent about five months in state prison for the revocation of his state supervision. (R. 590 at 3.)

Next, after Harris's release from state custody, the district court placed Harris on home confinement with electronic monitoring. (R. 568 at 3–4.) But home confinement ended when Harris lost his job and became homeless. (R. 554 at 5.) The district court

temporarily ordered Harris detained pending transfer to community corrections facility. (R. 555.) A few days later, the court granted Harris's request to place him at a Salvation Army shelter. (R. 557; R. 559.)

Housing at the Salvation Army did not work out. The shelter reported that Harris tested positive for recreational drugs while there. (R. 560 at 5.) The Salvation Army discharged Harris, and the court ordered his detention. (R. 564; R. 568 at 5.) Harris remained in detention for the remainder of the proceedings.

## III.    Pre-revocation motions

Harris was in detention when his state trial ended in acquittal, and he filed an emergency motion for his immediate release. (R. 584.) The district court (a new judge assigned to the case after Judge Feinerman's retirement) summarily denied the motion, concluding that grounds for detention still existed. (R. 586.)

Three days later, on June 26, 2023, Harris moved for calculation of his supervised release end date. (R. 587.) Harris's trial attorney explained that Harris started his three-year term of supervision at "some point in 2020." (R. 587 at 1.) But Harris's probation officer had been inconsistent about whether Harris's supervision ended in March 2023 or June 2024. (R. 587 at 1–2.) Counsel asked the court to determine whether the Harris's term of supervision had already expired. (R. 587 at 2.)

The government responded with two arguments for why the court should not worry about the end date of Harris's supervision. (R. 590.) First, the government argued that Harris's supervised release had not expired because the term was tolled under

18 U.S.C. § 3624(e). (R. 590 at 2–3.) The government presented a timeline of events, starting with Harris's entry into supervision on either March 17 or March 25, 2020 (the government could not determine the exact date):

1. **March 2020 to August 2020**: Harris spends about five months on supervision.

2. **August 2020 to January 14, 2021**: Harris is imprisoned when his state "parole" is revoked because of the new gun charge.

3. **January 14, 2021, to June 26, 2023**: Harris's supervision continues for another two years, five months, and 12 days.

(R. 590 at 2–3.) According to the government, Harris had served only about two years and 10 months of supervised release, because his supervision was paused while he was in Illinois prison for the state "parole" revocation. (R. 590 at 3–4.)

Alternatively, the government argued that even if Harris's supervision had expired, the court could still proceed on the alleged violation related to unlawful firearm possession. (R. 590 at 3–4.) Because the court had previously issued a warrant related to the gun possession, the government explained, it retained jurisdiction under 18 U.S.C. § 3583(i) to address that violation even if the supervision period expired. (R. 590 at 3–4.) The government did not argue that the court could consider any other violation in this scenario.

The same day the parties briefed the supervision timeline (June 26, 2023), the court issued a new summons listing all of Harris's alleged violations of supervised release. (R. 589.) Prior to this summons, the court had not issued a summons or warrant related to

6

any violation except for the alleged gun possession. The court did not rule on Harris's motion at this time, but it proceeded under the assumption that it had jurisdiction over all violations.

## IV.    Evidentiary Hearing

The government proceeded to present evidence on three allegations: (1) Harris's failure to comply with Salvation Army rules; (2) Harris's illegal possession of a firearm; and (3) Harris's role in a fight at the federal prison in Chicago. Regarding the third allegation, the government had not filed any written notice; defense counsel learned about it because he received video of the fight in discovery. (Evid. Tr. at 3–4.) At the outset of the evidentiary hearing, defense counsel said that Harris would be "in a position to admit" the conduct at the Salvation Army, but he would otherwise fight the allegations. (Evid. Tr. at 3–4.)

### A.    Salvation Army conduct

The government presented several reports from the Salvation Army, related to Harris's drug use and failure to attend mandatory meetings while at the shelter. (Evid. Tr. at 7–10.) These violations resulted in Harris's expulsion from the shelter and unsuccessful discharge from its drug-treatment program. (Evid. Tr. at 10.)

Harris's trial attorney stated that Harris did not disagree with anything in the reports, but Harris himself interrupted to say "[t]hat's a lie." (Evid. Tr. at 10.) The district court did not ask Harris to clarify his comment. And the parties moved on to the other allegations.

## B.    Alleged gun possession

Rather than call witnesses to testify, the government submitted transcripts from the prior state court proceedings. (Evid. Tr. at 12.) It also played a 911 call, pole-camera video, and police bodycam video from the day in question. (Evid. Tr. at 15–17.)

The evidence showed that police responded to an anonymous 911 call about a man carrying a gun in a brown satchel. (Evid. Tr. at 12–13, 15–16.) Police arrived at the location and found that Harris matched the description from the 911 call. (Evid. Tr. at 13, 17–18.) When police approached, Harris abandoned the bag on a nearby snow cone stand and fled. (Evid. Tr. at 13, 16.) Officers chased down and arrested Harris. (Evid. Tr. at 13–14, 16, 18.) They also retrieved the bag, which contained a handgun. (Evid. Tr. at 13–14, 18–19.)

The government conceded that a defense witness named LaDonna Crawford testified in the state trial that the bag (a purse) and gun inside it were hers. (Evid. Tr. at 14–15.) She also provided a receipt and gun lockbox to prove her ownership, and the purse itself contained Crawford's insulin. (Evid. Tr. at 14.) But the government argued that Harris ditched the bag and fled because he knew the gun was inside. (Evid. Tr. 30.) And to undermine any claim that Harris was unaware of the gun, the government cited what it says was Harris's inconsistent explanations for why he ran: He initially told police that he ran because he had marijuana or ecstasy on him, but his state trial attorney later argued to the jury that that he ran because he knew he had an active arrest warrant. (Evid. Tr. at 15, 19–20, 31.)

The government also cited how Harris, when explaining that the purse was not his, told police that they would find Crawford's insulin in the bag. (Evid. Tr. at 20.) The government argued that Harris would not know about the insulin unless he already knew the purse's contents. (Evid. Tr. at 30.) It further argued that the 911 caller would not have known about the gun unless Harris previously took it out. (Evid. Tr. at 30.)

Harris countered with transcripts from the state trial, outlining how Crawford owned the gun and kept it in her purse pursuant to an Illinois concealed carry license. (Evid. Tr. at 24.) Crawford had testified that she helped a friend pick up groceries and, when the friend's adult children came down to unload the car, they accidentally took Crawford's purse with the groceries. (Evid. Tr. at 24.) When Crawford realized her purse was missing, she called her friend to look for it. (Evid. Tr. at 25.) Harris was a mutual acquaintance of both women, so they sent Harris to bring the purse back to Crawford. (Evid. Tr. at 25.) Harris was waiting for Crawford when the police showed up. (Evid. Tr. at 25.) Crawford did not warn anyone about the gun in the purse, because she was instructed during her licensure training not to tell people about it. (Evid. Tr. at 25.) Based largely on this testimony, the defense emphasized, a state jury acquitted Harris of gun-possession charges. (Evid. Tr. at 26.)

As for the government's other points, the defense argued that the 911 caller's identity was unknown and could have been someone trying to set up Harris. (Evid. Tr. at 31.) Nothing in the pole-camera video suggested that Harris had removed the gun or was acting in a way that would trigger the 911 call. (Evid. Tr. at 32.) And Harris was a friend of

several years of Crawford, and thus would be expected to know that she used insulin. (Evid. Tr. at 26.) Moreover, state investigators found no fingerprints or DNA evidence showing that Harris touched the gun. (Evid. Tr. at 32.)

### C. Prison fight

Finally, the government presented evidence of a fight amongst Harris and multiple other inmates at the federal prison in Chicago. (Evid. Tr. at 33–34.) One inmate was stabbed in the brawl, though the government conceded that it had no evidence Harris was the one who stabbed him. (Evid. Tr. at 34.) The government argued, however, that security video showed Harris instigating the fight. (Evid. Tr. at 34–36.) The government also played a recorded phone call between Harris and his cousin, in which the cousin suggested that Harris planned the fight. (Evid. Tr. at 38.) The fight itself was off camera (Evid. Tr. at 37), and Harris also suffered injuries. (Evid. Tr. at 37, 40–41.)

Harris gave a sworn statement. (Evid. Tr. at 44.) He admitted responsibility for his part in the fight, but said he was only one in a group of nine fighting inmates. (Evid. Tr. at 45.) He said he was not normally the type of person to be involved with violent crimes. (Evid. Tr. at 45.) He also described his injuries from the fight, having been hit in the back of the head with a lock. (Evid. Tr. at 45.)

## V. The district court's ruling

The district court found that Harris had committed two violations of supervision release: (1) committing the new crime of unlawful possession of firearm ("Violation

Number 1"); and (2) failing to participate in mandatory programming at the Salvation Army ("Violation Number 8"). (App. at 37.)

Regarding the first violation, the court reasoned that the dispute came down to "whether Mr. Harris knew that there was a firearm in the purse that he was holding." (App. at 3.) The court found that he did, for four main reasons. First, the 911 caller knew about the gun, suggesting that the caller "had seen a gun placed into that purse." (App. at 3.) Second, Harris abandoned the bag when he fled police, suggesting that "he knew that there was something in it that he shouldn't have." (App. at 4.) Third, Harris knew that there was insulin in the bag, suggesting he looked inside. (App. at 5.)

Fourth and finally, the court found that Harris's "inconsistent statements about why he ran" undermined his credibility. (App. at 5.) Although Harris claimed to have drugs, the court explained, no drugs were found on Harris or in the bag. (App. at 5–6.) The court also focused on what it saw as Harris's alternative claim that he had fled because he had an arrest warrant. (App. at 5.) Not only was this inconsistent with the drug explanation, but the court also found it not credible because it reasoned that Harris had no identification on him or reason to think police would execute an arrest warrant at that location. (App. at 5.)

The court also briefly cited two other, minor facts weighing against Harris's credibility: (1) Harris tried to bargain with police after his arrest, offering to cooperate to locate other guns for them; and (2) he wore the purse in a "crossbody fashion suggesting

that whatever was in the bag needed to be securely held." (App. at 6.) The court clarified,

however, that it did not put much weight on either of these facts. (App. at 6.)

Although it found Harris guilty of gun possession, the court credited Crawford's

trial testimony that she owned the gun and was relying on Harris to fetch her purse. (App.

at 8.) The court recognized that this evidence suggested that Harris possessed the gun

only temporarily. (App. at 8–9.) It explained that even temporary possession is a violation

of the law. (App. at 9). But the court mused that "on the spectrum of the seriousness of

crimes committed by people possessing firearms as felons," Harris's offense "is not …

the most serious species of a violation." (App. at 8–9.)

Regarding the Salvation Army conduct, the court found that Harris "admitted"

this violation. (App. at 9.) The court considered the violation to be serious because it not

only revealed Harris's "significant drug problems," but also showed "a significant

disrespect for the rule of law and inability to abide by conditions of release." (App. at 9.)

Finally, the court said it would consider the prison fight as relevant conduct at

sentencing. (App. at 9–11.) But it would not consider the fight as a formal violation

because the government did not notify Harris or the court of the violation in writing prior

to the hearing. (App. at 11.)

Because the new firearm offense as a grade B violation, it resulted in an advisory

range of 21 to 27 months' imprisonment under the Sentencing Guidelines' relevant policy

statement. (App. at 12.) U.S.S.G. § 7B1.4. The Salvation Army conduct did not affect the

range, because it was a lesser grade C violation. (App. at 12.) U.S.S.G. § 7B1.1(b).

Although the government requested a sentence within the guidelines (App. at 13), the court imposed a statutory maximum sentence of 36 months. (App. at 31.) The sentence was composed of two sentences of 36 months and 24 months, the statutory maximums based on each of Harris's two underlying criminal convictions, to be served concurrently. (App. at 32; App. at 38.)

Finally, the district court denied Harris's motion to calculate the end date of his supervision period, "for the reasons set forth in the Government's response." (R. 593.)

## Summary of Argument

James Harris's term of supervised release ended in March 2023. At that time, the district court lost jurisdiction to adjudicate any violation related to Harris's conduct at the Salvation Army. *See United States v. Block*, 927 F.3d 978 (7th Cir. 2019). The government is wrong that Harris's federal supervision was tolled during his time in state prison. He was detained for revocation of a state supervision sentence, which does not toll the term of federal supervised release because it is not imprisonment "in connection with a *conviction* for a Federal, State, or local crime." 18 U.S.C. § 3624(e) (emphasis added). *See also Block*, 927 F.3d 978 (revocation of federal supervision does not toll supervision). The district court should have dismissed the Salvation Army conduct (Violation Number 8) for want of jurisdiction.

Alternatively, the court erred when it accepted trial counsel's admission to the Salvation Army conduct. Harris vocally disagreed with counsel during the hearing, and the record does not otherwise show that he knowingly and voluntarily waived his right to contest the allegation.

Regarding the new gun charge (Violation Number 1), the court erred by relying on inaccurate information to find Harris not credible. The evidence on this violation was close—a jury acquitted Harris of the same conduct. Adjudication came down to whether the court believed that Harris was unaware of the gun inside the purse. And on the crucial issue of Harris's credibility, the court misconstrued the closing arguments from Harris's state trial as Harris's own "inconsistent statements." This error requires a new hearing.

**Argument**

I. **The district court lacked jurisdiction to consider the alleged violations at Salvation Army because Harris's supervision had already expired.**

    A. **Standard of review**

This Court reviews *de novo* the district court's jurisdiction to adjudicate an alleged violation. *United States v. Block*, 927 F.3d 978, 981 (7th Cir. 2019).

    B. **Federal supervision is tolled only by imprisonment "in connection with a conviction."**

A period of supervised release starts "on the day" that the supervisee is released from prison. 18 U.S.C. § 3624(e). Supervision is then tolled "during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days." 18 U.S.C. § 3624(e).

In *Mont v. United States*, the Supreme Court explained that tolling under § 3624(e) applies to any prison time that is "credited as time served for a new conviction." 139 S. Ct. 1826, 1832 (2019). This can include pretrial detention, if that detention is later counted as part of the sentence for the "new conviction." *Id.* The period is not tolled, however, for any time a supervisee spends in detention as part of a revocation of supervised release or when otherwise reincarcerated as a result of an earlier conviction. *United States v. Block*, 927 F.3d 978, 982 (7th Cir. 2019). "Congress has explicitly allowed for tolling only when the defendant is imprisoned on another charge, it does not intend for district courts to toll supervised release under any other circumstance." *United States v.*

15

*Cole*, 567 F.3d 110, 115 (3d Cir. 2009) (district courts cannot toll supervised release for period when immigrant is removed from country).

A district court can retain jurisdiction to revoke a supervisee after the period of supervision expires "if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation." 18 U.S.C. § 3583(i). Mere notice of a revocation hearing is insufficient to retain jurisdiction. *Block*, 927 F.3d at 984. Congress "expressly required a warrant or a summons" before expiration of the supervision term, even when (as in this case) the supervisee has already been detained by the district court. *Id.* at 984. Although issuance of the summons may seem "*pro forma* and practically meaningless" under such circumstances, Congress created a bright-line rule. *Id.* at 985. Detention orders and notices of hearings are not sufficient to retain jurisdiction. *Id.* at 983–84.

### C. Harris's supervision ended before the district court held a revocation hearing or issued a summons related to the Salvation Army allegations.

The district court lost jurisdiction to consider Harris's conduct at the Salvation Army when his supervised release ended in March 2023. Harris started his three-year period of supervision on either March 17 or March 25, 2020. (R. 590 at 2 n.1) Not until June 2023—three months after supervision ended—did the district court issue a summons related to Harris's failure to participate in programming at the shelter. This violation should be dismissed from the judgment, and Harris should be resentenced.

In the district court, the government argued that Harris's supervision period had not expired because it was tolled while Harris was in state custody for an Illinois "parole" revocation. (R. 590 at 2–3.) The government was doubly wrong.

First, Harris was never on "parole," because parole was unavailable to him under Illinois's system of determinate sentencing. *See* 730 ILCS 5/3-3-3. Rather, he was serving a two-year sentence of "mandatory supervised release" following completion of a five-year prison sentence. (App. at 51.) (This Court may take judicial notice of state court documents, which have been attached to the appendix. *See* FED R. EVID. 201; *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 492–93 (7th Cir. 2011).) Any detention in the Illinois Department of Corrections would be for revocation of that supervision, not for revocation of "parole."

Second, a revocation of supervised release does not toll the supervision period because it is not a new "conviction" within the meaning of 18 U.S.C. § 3624(e). This Court has already held that detentions for violation of federal supervised release do not toll under § 3624(e). *Block*, 927 F.3d at 982. And Harris's Illinois revocation is substantively identical. Like federal supervised release, Illinois mandatory supervised release is a separate sentence served after completion of a prison sentence. *Compare Round v. Lamb*, 2017 IL 122271, ¶ 20 *and United States v. Thompson*, 777 F.3d 368, 372 (7th Cir. 2015). Like federal supervised release, Illinois mandatory supervised release is a transition period—distinct from imprisonment—that is meant to reintegrate the offender back into society. *Compare Round*, 2017 IL 122271, ¶ 21 *and Johnson v. United States*, 529

U.S. 694, 709 (2000). And like federal supervised release, revocation of supervised release in Illinois is not a new imprisonment for a new conviction, only a ruling on how the supervisee must serve his supervision. *Compare Barney v. Prisoner Rev. Bd.*, 184 Ill. 2d 428, 430, 704 N.E.2d 350, 351 (1998) (a challenge to revocation proceedings is merely a challenge to "the manner in which [the defendant] would serve his term of mandatory supervised release.") *and Block*, 927 F.3d at 982 ("The Supreme Court has interpreted [the federal revocation statute] to mean a 'term of supervised release [can be] served, in whole or part, in prison.'") (quoting *Johnson*, 529 U.S. at 705). Revocations of federal supervised release do not toll under § 3624(e), and revocations of Illinois supervised release do not either.

The district court did not issue a timely warrant or summons related to Harris's conduct at the Salvation Army, as was necessary for it to retain jurisdiction after the supervision period expired. The court did retain jurisdiction to consider the gun charge, because it issued a warrant related to *that* violation on July 28, 2020, well within the supervision period. (R. 475.) But it did not issue a summons for the second violation until June 28, 2023, about three months after Harris's supervision ended. (R. 589; R. 590 at 2.) Other orders detaining Harris and scheduling hearings were insufficient to retain jurisdiction, because none of those orders was a "warrant" or "summons" within the meaning of § 3624(e). *See Block*, 927 F.3d at 983–84. Indeed, the government essentially conceded in the district court that, if the supervision period were expired, the court would retain jurisdiction only as to the gun charge. (R. 590 at 3–4.) It has thus waived any

argument to the contrary for appeal. *See United States v. Buncich*, 20 F.4th 1167, 1172 (7th Cir. 2021); *Gutierrez v. Schomig*, 233 F.3d 490, 491 n.1 (7th Cir. 2000).

This Court may wonder whether any error here was harmless. After all, the district court found Harris responsible for two violations: (1) the possession of a firearm, in violation of 18 U.S.C. § 922(g); and (2) failure to participate in programming while at the Salvation Army. (App. 47.) Even if the district court did not consider the Salvation Army conduct, it could still have revoked Harris for the gun charge. And under the guidelines, the gun possession, a grade B violation, was more serious than the alleged grade C violation of failing to participate at the Salvation Army. (App. at 12.)

But unlike the advisory guidelines, the district court did not view the gun charge as more serious. It found credible the explanation that Harris possessed the gun only "temporarily." (App. at 9.) The court explained that "even temporary possession with the knowledge that there was a gun in that purse is a violation of the law. It is not, however, the most serious species of a violation, and that is something as well that the Court takes into account." (App. at 9.)

The court's characterization of the gun possession as "not … the most serious" was significant because the gun possession alone set Harris's guideline range of 21 to 27 months because. *See* U.S.S.G. § 7B1.1(b). Yet, although the district court believed that this violation was not that serious, it did not think that the guidelines range was too high because it found Harris guilty of the Salvation Army conduct too. Indeed, the court repeatedly referred to Harris's conduct at the Salvation Army as another grade B

violation, even after the probation officer corrected him that it was a grade C violation. (App. at 12, 29.) In other words, the court thought that Harris's failure to participate in the Salvation Army's programming was both revocable and as serious as the gun possession.

This Court should also not be distracted by the district court's finding that Harris "admitted" to the Salvation Army conduct. Jurisdictional arguments, like the one Harris raises here, cannot be waived. *Block*, 927 F.3d at 981. And even if the issue were waivable, Harris preserved it when he moved for calculation of his supervision's end date. (R. 587.) On top of that, Harris's admission to the conduct was muddled at best, as explained in the next section. Waiver requires the defendant to intentionally relinquish a known right, *United States v. Castaneda*, 77 F.4th 611, 615 (7th Cir. 2023), something the record here does not show here.

This Court should vacate the judgment and remand with instructions to dismiss Violation Number 8 for lack of jurisdiction.

## II.     Harris did not knowingly and voluntarily admit to the Salvation Army conduct.

### A.     Standard of review

This claim invokes Harris's rights under the federal rules and the due process clause of the Fifth Amendment. Interpretations of the federal rules and issues of constitutional law are both reviewed *de novo*. *United States v. Lee*, 77 F.4th 565, 575 (7th Cir. 2023) (federal rules); *United States v. Mosley*, 759 F.3d 664, 667 (7th Cir. 2014)

(constitutional arguments). Harris preserved this claim when he interrupted his lawyer to dispute his lawyer's admission to the violation. (Evid. Tr. at 10.)

**B.    Any admission to an alleged violation of revocation must be knowing and voluntary.**

Although not subject to Federal Rule of Criminal Procedure 11 (the rule applicable to guilty pleas), admissions to violations of supervised release must still be knowing and voluntary. *United States v. LeBlanc*, 175 F.3d 511, 516–17 (7th Cir. 1999). Defendants have a due process right to contest alleged violations of supervision under the Fifth Amendment and Federal Rule of Criminal Procedure 32.1. *Id.* at 515. To determine whether a defendant's waiver of his right to challenge a violation was knowing and voluntary, courts look at the totality of the circumstances. *Id.* at 517.

District courts may skip a formal colloquy before accepting an admission—but only if the record confirms that the defendant "had a sufficient grasp of a particular right or consequence of the waiver." *United States v. Nelson*, 931 F.3d 588, 591 (7th Cir. 2019) (quoting *United States v. Boultinghouse*, 784 F.3d 1163, 1172 (7th Cir. 2015)). Before accepting an admission, a court should be able to determine that the defendant understands the charges and possible consequences of the waiver. *LeBlanc*, 175 F.3d at 517. A defendant's equivocation when admitting conduct is evidence that the admission is not knowing and voluntary. *Id.*

### C. Contrary to the district court's findings, Harris did not admit to any violation.

The district court found that Harris "admitted" the Salvation Army conduct, and so it saw "no need for the Court to delve into that [violation] in any great detail." (App. at 9.) The record, however, does not show any such admission.

Harris's *lawyer* made comments about Harris's potential desire to admit the violation, but the lawyer's comments were equivocal. At the outset of the evidentiary hearing, trial counsel said that Harris was "in a position to admit" the violation. (Evid. Tr. at 3.) But he did not explicitly say that Harris wanted to do so. Later, when the government presented its evidence, trial counsel again stated that he would not challenge any of the facts alleged in the Salvation Army's reports. (Evid. Tr. at 10.) But again, counsel did not explicitly say that *Harris* wanted to admit those facts, nor that *Harris* wanted to admit that the facts stated a violation.

Harris, on the other hand, was *un*equivocal—but in the opposite direction. When Harris's lawyer said that he would not disagree with any facts in the Salvation Army's reports, Harris interrupted to say "[t]hat's a lie." (Evid. Tr. at 10.) The district court did not ask Harris what he meant by this outburst, nor did it ever ask Harris directly whether Harris wanted to challenge the violation.

The totality of the circumstances does not show a knowing and voluntary waiver of Harris's right to contest the violation. At best, Harris's silence during parts of the proceeding demonstrates an equivocal acceptance of his counsel's representations. At

worst, Harris actively disagreed with his counsel's failure to contest the violation. Either way, the district court erred by accepting the admission. *See LeBlanc*, 175 F.3d at 517. If this Court does not instruct the district court to dismiss this violation for lack of jurisdiction, it should still vacate the judgment and remand for new proceedings.

## III. The district court relied on inaccurate information to find that Harris knowingly possessed a firearm.

### A. Standard of review

This Court reviews *de novo* a claim that the district court relied on inaccurate information at sentencing. *See United States v. Miller*, 900 F.3d 509, 513 (7th Cir. 2018).

### B. Harris had a right to be sentenced according to accurate information.

Criminal defendants have a due process right to be sentenced based on accurate information. *United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Oliver*, 873 F.3d 601, 608–09 (7th Cir. 2017). "Reliability is a central ingredient of the due process analysis." *United States v. Helding*, 948 F.3d 864, 870 (7th Cir. 2020). A defendant can successfully challenge a sentence by showing that inaccurate information was before the district court, and that the court relied on that inaccurate information when imposing sentence. *Oliver*, 873 F.3d at 608–09 (quotation omitted).

The defendant's burden in making this showing is "low" and requires "only that 'false information was part of the basis for the sentence.'" *Miller*, 900 F.3d at 513 (quoting *United States v. Barnes*, 907 F.2d 693, 696 (7th Cir. 1990), and *U.S. ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984)). Harmless-error review does not apply: A defendant need not show prejudice resulted from the false information, only that the

court relied in any part on the inaccuracy. *Id.* at 514 (citing *Welch*, 738 F.2d at 868). Even a "single misinformed comment" will warrant resentencing if it shows that inaccurate information influenced the sentence. *Miller*, 900 F.3d at 514 (collecting cases).

A defendant's right to be sentenced on accurate information applies equally to revocation proceedings, as it does to an initial sentencing. *See United States v. White*, 868 F.3d 598, 603 (7th Cir. 2017) (applying *Tucker* to revocation sentencing).

### C. The district court misconstrued an attorney's closing arguments during Harris's state trial as Harris's own statements.

The big issue at Harris's revocation was whether Harris knew that a gun was in the purse he had been holding. (App. at 3.) A jury found that Harris did *not* know about the gun when it acquitted him of state gun charges. (Gov't Ex. A-1 at 135.) But the government argued that the jury got it wrong in part because of Harris's "changing explanations" for why he ran from the police. (Evid. Tr. at 31.) The court accepted this argument, citing Harris's "inconsistent statements about why he ran" as one of the main reasons for finding that Harris knowingly possessed the gun. (App. at 5.) The court relied, however, on an inaccurate understanding of the record when it made this finding.

The government cited three different statements as evidence that Harris kept changing his story about why he ran:

1. While being driven to the police station, Harris said he ran because he had marijuana. (Evid. Tr. at 19, 31.)

2. Later during the same car ride, Harris said he ran because he had an ecstasy pill. (Evid. Tr. at 20, 31.)

3. In closing argument during his state trial, Harris's trial attorney suggested that Harris ran because he had a parole violation and knew there was a warrant out for his arrest. (Evid. Tr. at 15, 31.)

The third statement sticks out because it was not a statement by Harris. Rather, it was an argument by Harris's prior attorney about an inference the state jury could draw from the evidence. (Gov't Ex. A-1 at 111.) The transcript submitted by the government shows a zealous trial advocate providing a plausible explanation for why Harris ran, as part of an argument for why the jury should find reasonable doubt. The transcript does not, as the government suggested, show an example of Harris's testimony or Harris himself changing his story.

The district court did not catch this distinction. When discussing Harris's "inconsistent statements," the court focused on the claim that Harris ran because he knew he had an arrest warrant. (App. at 5.) The court discussed at length why it did not accept that story, without acknowledging that it was merely an argument made by Harris's former attorney. (App. at 5.) It conflated another person's legal argument with Harris's personal testimony and statements, misunderstanding that this version of events had not come from Harris himself. By citing misinformation at sentencing, the court violated Harris's right to due process. *Miller*, 900 F.3d at 514

When it came to the gun charge, the result hinged upon whether the district court believed that Harris did not know the gun was in the bag. The evidence was close. A jury acquitted Harris. And apart from Harris's "inconsistent statements" (App. at 5), the other reasons the district court gave for discrediting Harris all had alternative explanations. Yes, a 911 caller knew about the gun—but no one knows the caller's identity or motivations, and the pole-camera video did not show any activity to trigger the 911 call. (Evid. Tr. at 31–32.) Yes, Harris knew about the insulin in the bag—but he had known Crawford for years and presumably knew that she used insulin. (Evid. Tr. at 26.) Yes, Harris offered to cooperate with police and wore the purse in a "crossbody fashion"—but even the district court recognized that these facts bore little weight toward Harris's credibility.

Harris does not need to show prejudice from the district court's error. *See Miller*, 900 F.3d at 514. But because the court's credibility determinations were based on a false foundation, the harm here is apparent. By finding Harris not credible, the court subjected him to a guidelines range of 21 to 27 months' imprisonment. (App. at 12). U.S.S.G. § 7B1.4. If the court had instead believed Harris's story, it likely would have dismissed the more serious grade B violation. In that case, even if the court revoked Harris for the Salvation Army conduct, Harris would have been subject to a guidelines' range of only 8 to 14 months. U.S.S.G. § 7B1.4. And because the district court lacked jurisdiction to adjudicate any other violations (see subsection I), Harris could have avoided revocation altogether.

This Court should vacate the judgment and remand for new findings on the gun charge.

## Conclusion

This Court should vacate the judgment and remand with instructions to (1) dismiss Violation Number 8 for lack of jurisdiction or, alternatively, hold new revocation proceedings related to that violation; and (2) hold a new evidentiary hearing on the issue of whether Harris knowingly possessed a firearm, as necessary for revocation on Violation Number 1.

Respectfully submitted,
THOMAS W. PATTON
Federal Public Defender

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JAMES HARRIS

**Certificate of compliance with Fed. R. App. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32 in that it contains

6,766 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Dated: January 10, 2024

No. 23-2421

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

JAMES HARRIS,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:11-CR-00667
The Honorable Judge John J. Tharp

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, JAMES HARRIS

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:   (217) 373-0666
Fax:         (217) 373-0667
Email: Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JAMES HARRIS

**Certificate of compliance with Circuit Rule 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of the

materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this

brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Date: January 10, 2024

# Appendix table of contents

Page

Certification...............................................................................................ii

Revocation and Sentencing Transcript, July 14, 2023 ......................................A1

Revocation Judgment.................................................................................A37

*People v. Harris*, 16CR1592401 (Ill. Cir. Ct. Cook County)

    Criminal Disposition, February 22, 2018 .............................................A43

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,        )
 4                                   )
                       Plaintiff,    )
 5                                   )
    -vs-                             )
 6                                   )  Case No. 11 CR 667-5
                                     )
 7  JAMES HARRIS, also known as      )  Chicago, Illinois
    Tyrell,                          )  July 14, 2023
 8                                   )  9:58 a.m.
                       Defendant.    )
 9

10                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOHN J. THARP, JR.
11
    APPEARANCES:
12
    For the Plaintiff:     UNITED STATES ATTORNEY'S OFFICE
13                         BY:  MR. VIKAS KUMAR DIDWANIA
                           219 S. Dearborn Street
14                         Room 500
                           Chicago, IL 60604
15
    For the Defendant:     LAW OFFICES OF JAMES A. GRAHAM
16                         BY:  MR. JAMES A. GRAHAM
                           53 W. Jackson Boulevard
17                         Suite 703
                           Chicago, IL 60604
18

19

20

21

22  Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
                           Official Court Reporter
23                         United States District Court
                           219 South Dearborn Street, Room 2328A
24                         Chicago, Illinois  60604
                           Telephone:  (312) 818-6626
25                         kmftranscripts@gmail.com
```

1    (Proceedings heard in open court:)

2         THE CLERK:  Calling case 11 CR 667-5, U.S.A. v.

3    Harris.

4         You may put your appearances on the record.

5         MR. GRAHAM:  Good morning, Judge.  James Graham on

6    behalf of James Harris who is present in the courtroom.

7         THE COURT:  Good morning.

8         Good morning, Mr. Harris.

9         THE DEFENDANT:  Good morning, Judge Tharp.

10        MR. DIDWANIA:  Good morning, Your Honor.  Vikas

11   Didwania on behalf of the United States.

12        PROBATION OFFICER:  Good morning, Your Honor.  Morgan

13   Calhoun with U.S. Probation.

14        THE COURT:  Good morning.

15        All right.  We're here for continuation of the

16   revocation proceeding against Mr. Harris.  We had an

17   evidentiary hearing on Wednesday.  I think it was Wednesday.

18   And I have reviewed the materials that the parties referenced

19   in their presentations at the evidentiary hearing, including

20   the various videos and the transcripts of the state court

21   proceeding, or proceedings, both the preliminary hearing and

22   the trial, and I am prepared to go forward at this juncture.

23        Taking the what's I think most in dispute.  First, we

24   have the issue of the alleged violation of the -- alleged

25   violation No. 1, the unlawful possession of a firearm as a

1  felon allegation.  There is no dispute that Mr. Harris
2  possessed a firearm on July 21st of 2020, that he was a
3  convicted felon at the time that he possessed that firearm,
4  and that he knew he was a convicted felon.  The only dispute
5  is whether Mr. Harris knew that there was a firearm in the
6  purse that he was holding.  And I find by a preponderance of
7  the evidence that he did know that there was a firearm in that
8  purse or satchel or whatever one wants to call it.  I'll
9  explain my reasoning.

10       Contrary to the argument that no one saw Mr. Harris
11  with a gun, the 911 caller plainly did.  We don't know the
12  identity of that person, but the report was absolutely
13  accurate.  It described Mr. Harris to a T, said he had a gun
14  in a purse he was holding.  Harris was exactly where the
15  caller indicated he would be at the snowball stand.  He was
16  wearing the clothing described.  He had the bag that had been
17  described.  And most significantly indeed the bag had a gun in
18  it as the caller had described.  If the 911 caller knew
19  Mr. Harris had a gun, it's inconceivable that Mr. Harris did
20  not know that as well.  Clearly the caller had seen a gun
21  placed into that purse.

22       I'll note that this evidence was not presented at the
23  trial, the evidence of the 911 call, presumably because the
24  call would likely constitute hearsay if the Rules of Evidence
25  applied.  But the Rules of Evidence don't apply in supervised

1  release revocation proceedings, and it's perfectly appropriate

2  to consider that evidence here, particularly when it is, as

3  I've indicated, accurate and reliable.

4          Mr. Harris -- next, Mr. Harris abandoned the bag as

5  soon as he saw police arriving at the general location of the

6  snowball stand and before it was clear even that they were

7  going to be stopping at the snowball stand.  If you look at

8  the POD video very carefully, you can see that Mr. Harris

9  catches sight of the police car before it even stops as it's

10  going down the street in the opposite direction of the

11  appropriate traffic on the one-way street.  When Mr. Harris

12  sees that, he immediately removes the bag which was a

13  crossbody around the one shoulder and on the other side.  He

14  immediately removes the bag and drops it on a table and then

15  turns around and tries to walk away nonchalantly until one of

16  the responding officers focuses on him, and that's when

17  Mr. Harris begins to run.

18          There's absolutely no reason that Mr. Harris would

19  take the bag off and leave it as he did unless he knew that

20  there was something in it that he shouldn't have in his

21  possession.  The defense that was offered at the trial was he

22  was running because he knew there was a warrant out for his

23  arrest.  That's no reason to dump the bag because the bag

24  didn't have any identification in it that would reveal

25  Mr. Harris's identification.  And Mr. Harris indeed, his

1    protests after he was arrested were that none of the

2    information in the bag was about him.  So I see no reason at

3    all that Mr. Harris, if he was worried about the police for

4    some other reason, would have discarded the bag.

5         Next, the evidence establishes that Mr. Harris knew

6    that there was insulin in the bag.  He refers to insulin being

7    in the bag during the station house interview.  That's

8    Exhibit 8, or Exhibit B-8, at about 4 minutes and 30 seconds

9    into the interview.  Mr. Harris had no way of knowing that

10   there was insulin in that bag unless he looked inside the bag.

11        Next we have Mr. Harris's inconsistent statements

12   about why he ran which all combine as well to undermine his

13   credibility.  You know, we have the argument that he ran

14   because there was an arrest warrant, but he had no ID on him

15   at the time that he ran, and there's no reason police would

16   have suddenly shown up at that spot to execute an arrest

17   warrant for Harris.  He knows the police have shown up because

18   there's been some sort of disturbance which is also

19   corroborated by the information provided by the 911 caller.

20        At other points after his apprehension, Mr. Harris

21   claims that he was selling drugs.  There were no drugs found

22   on him.  There were no drugs in the bag.  Mr. Harris also

23   alternatively says he threw the weed that he had on him, but

24   there's no sign that can be discerned on video of him doing

25   that.

1    That also goes back to the point of why he would

2  leave the bag.  You know, clearly he left the bag because

3  there was something that he did not want to be caught with.

4  You know, he didn't take the bag with him on the run as he

5  claimed he did with the weed that he had on him.  During his

6  station house interview, he also says he ran because he had an

7  ecstasy pill in his pocket, not because he had weed on him, so

8  yet another explanation offered for why he ran.

9    We also have the curious statement, and I don't put a

10  great deal of weight on this statement, but Mr. Harris can be

11  heard when he's being transported telling -- offering to get

12  the police more guns if they'll let him out the back door.

13  All of these kind of statements are inconsistent and make it

14  very difficult to credit the idea that Mr. Harris did not have

15  any idea what was in the bag.

16    As far as the bag itself, he was wearing it in a

17  crossbody fashion suggesting that whatever was in the bag

18  needed to be securely held.  And the bag itself is not large

19  and contained both a firearm and two loaded magazines.  Again,

20  I don't put a lot of weight on this fact, but, again, and

21  particularly in light of all the factors, it's hard to imagine

22  that Mr. Harris, who claimed to know Ms. Crawford and know

23  that she was a licensed handgun owner who goes to the range a

24  lot, makes his claim that he didn't know what was in the --

25  that there was a gun in the purse very difficult to credit.

1    As far as the arguments about what the police

2 investigators did or did not do -- well, I guess the argument

3 is what they did not do, that's not the question.  The only

4 relevant issue is whether the evidence presented establishes

5 that it's more likely than not that Mr. Harris knew there was

6 a gun in the purse; and for the reasons I've indicated, I

7 think the evidence does establish that.

8    As for the officer whose body-worn camera was not

9 activated, I see no reason to discredit his explanation.  It's

10 not a situation as if all three of the responding officers who

11 were working together didn't activate their cameras.  And I

12 find the officer's explanation that, you know, he tried to

13 activate the camera as he was chasing Mr. Harris to be a

14 credible explanation for -- you know, but that the camera

15 didn't start.  He tried to activate it but it didn't start.

16 Given those circumstances, I find that to be a credible

17 explanation.

18    The other argument offered during the hearing was

19 that someone who knows Ms. Crawford well was trying to set up

20 Harris.  That is extraordinarily farfetched to say the least,

21 and there's no -- that would be inconsistent with all of the

22 evidence that the government presented.

23    The last argument offered by the defense was that

24 it's somehow bad forum to address the case here after the jury

25 acquitted Mr. Harris of the firearm possession charge.  I know

1  counsel is aware of these issues, but No. 1, we're dealing

2  with a different sovereign here, so there is no -- the jury

3  trial result has no bearing on the federal government's

4  ability to proceed against Mr. Harris for this conduct.

5  In this hearing on a revocation matter, there is a

6  lower standard of proof.  It's not the beyond a reasonable

7  doubt standard of proof but rather preponderance of the

8  evidence standard.  As I've already mentioned, the Rules of

9  Evidence do not apply in revocation proceedings, and as a

10  result, the jury did not have all of the evidence that's

11  available to this Court in considering the question of whether

12  Mr. Harris knew there was a gun in that bag.  The jury didn't

13  hear the 911 call.  The jury didn't see the POD cam video.

14  The jury didn't hear about Mr. Harris's statements about there

15  being insulin in the purse.  And all of that information is

16  highly probative of his knowledge about that fact.

17  Finally, with respect to this issue that Mr. Harris

18  knew there was a gun in the bag is not inconsistent with

19  Ms. Crawford's testimony about the circumstances that, you

20  know, transpired that day.  And, you know, in finding that

21  Mr. Harris knew that there was a gun in the purse, while that

22  establishes his, you know, violation of the law against

23  prohibiting felons from possessing firearms, on the spectrum

24  of the seriousness of crimes committed by people possessing

25  firearms as felons, this scenario, which, again, is not

1  inconsistent with the evidence, you know, might well suggest

2  that Mr. Harris only had the gun temporarily.  But even

3  temporary possession with the knowledge that there was a gun

4  in that purse is a violation of the law.  It is not, however,

5  the most serious species of a violation, and that is something

6  as well that the Court takes into account.  So that's my

7  ruling with respect to the gun charge violation.

8          The Salvation Army conduct which is violation No. 8

9  in the series of special reports from probation was admitted

10  so there's no need for the Court to delve into that in any

11  great detail.  That conduct is I think probative of both the

12  fact that Mr. Harris has some significant drug problems, is

13  consistent with his criminal history, and has a significant

14  disrespect for the rule of law and inability to abide by

15  conditions of release.

16          The third incident that's at issue and evidence was

17  presented on was the MCC fight that occurred a month or so

18  ago.  That conduct is I think disturbing.  I agree with -- and

19  there's no dispute that there's no evidence that Mr. Harris

20  was responsible for the stabbing itself.  He was clearly

21  involved in instigating this incident.  I find the call that

22  he made to the individual identified as Cuzzo to be

23  particularly probative in that regard.  Mr. Harris was -- as

24  Cuzzo pointed out, had been for several months talking about

25  how he was going to try to, I guess for lack of a better word,

1  attack Mr. Price.  And clearly the video recitations reflect
2  that he was intimately involved in instigating that fight.
3      We don't have to be able to parse through the
4  individual actions in that incident in any greater detail.
5  It's clear that Mr. Harris was involved.  It's clear that this
6  conduct is very serious.  And rather than doing what he should
7  have been doing, which would be distancing himself from any
8  such altercations, he's the one that, along perhaps with his
9  companion, the other Mr. Harris, instigated this
10  confrontation.  Or if he didn't instigate it and you want to
11  say Mr. Price instigated it by, you know, denigrating or
12  badmouthing Mr. Harris -- one or both of the Harrises doesn't
13  really matter.  There's -- you know, my goodness, even, you
14  know, children in elementary school are told that you don't
15  respond by -- with people talking ill of you by physical
16  altercation.  But that's what Mr. -- that's the path that
17  Mr. Harris took.
18      It's also relevant that all of this is occurring
19  while Mr. Harris is under supervision and while revocation
20  proceedings are underway with respect to his supervised
21  release, a time when you would think he would try to be on his
22  absolute best behavior.  But instead we've got him engaging in
23  what I agree with Mr. Cuzzo can only be described as
24  incredibly goofy conduct.  So I do find that Mr. Harris
25  engaged in that MCC fight.

1          I'm not sure -- we don't have a written special

2   report about that incident yet so we don't have a violation

3   number assigned to it.  Presumably, though, it is a violation

4   at least of the condition that Mr. Harris not violate any

5   state, federal, or local laws.  Battery is clearly a law that

6   has been violated by this conduct.  There are probably many

7   others as well.  But ultimately the way that the guidelines

8   calculate sentencing ranges, I don't know that it's even

9   necessary for us to classify the MCC fight as a violation of

10  some particular condition of supervised release.  It's conduct

11  that Mr. Harris engaged in that is relevant to the Court's

12  determination of the appropriate sanction to impose for the

13  violations of the Salvation Army condition, violation No. 8,

14  and the felon in possession incident which is violation No. 1.

15         All right.  Those are the Court's findings with

16  respect to the violation conduct.  I think it is undisputed

17  that the advisory guideline range pertaining to this conduct

18  is 33 to 41 months.  That's based on a grade A violation and

19  criminal history category of VI.  The maximum sentence that

20  could be imposed because Mr. Harris had two convictions on his

21  last substantive prosecution would be 60 months, 36 months on

22  Count One and 24 months on Count Two.

23         PROBATION OFFICER:  Your Honor, excuse me.

24         THE COURT:  Yes.

25         PROBATION OFFICER:  If I may add, that was based off

1   the original charge, was the habitual criminal charge.  That

2   was later dropped on June the 20th.  So now it turns into a

3   grade B which is 21 to 27 months.  However, Your Honor could

4   sentence Mr. Harris up to 36 months on Count One and 24 months

5   on Count Two.

6           THE COURT:  Yeah, that's -- what's different from --

7           PROBATION OFFICER:  The grade of the violation.  It's

8   now a grade B, and our recommendation --

9           THE COURT:  Oh, I thought the grade -- any violation

10  with a firearm was a grade A?  No?

11          PROBATION OFFICER:  No, Your Honor, it's just

12  specific type of firearm.

13          THE COURT:  Okay.  All right.  So they're both grade

14  B violations.

15          PROBATION OFFICER:  Correct, Your Honor.  The grade C

16  for the Salvation Army, and then the felon in possession of a

17  firearm is a grade B.

18          THE COURT:  All right.  So that's the guideline

19  picture, and I'm going to hear from each of the parties in

20  terms of what you think the appropriate sentence to impose

21  based on the findings of the Court with respect to

22  Mr. Harris's conduct may be.

23          I'll hear first from the government and then

24  Mr. Graham.

25          And then, Mr. Harris, if you want to address the

1    Court directly about the sentence or anything else you want to

2    raise, you'll have the opportunity to do that once Mr. Graham

3    has made his comments.

4           Mr. Didwania.

5           MR. DIDWANIA:  Thank you, Your Honor.

6           I'm sure, as the Court is aware, under

7    Section 3583(g), this is a situation that requires a mandatory

8    revocation and imprisonment because the violation did involve

9    a firearm.

10         The government's recommendation is a sentence within

11    the guidelines range, Judge, for a few reasons.

12         You know, the sentencing guidelines tell us that the

13    sanction should be primarily focused on sanctioning the fact

14    the defendant has failed to comply with the Court's orders and

15    then taking into account the seriousness of the offense and

16    the criminal history.

17         So I'll start with the seriousness of the offenses at

18    issue here.  One of the things I would note, Judge, is

19    although you stated that in the spectrum of felon in

20    possession violations that the Court has seen, here, you know,

21    Mr. Harris was just holding on to this bag for another

22    individual and so it may be not as nefarious.  But I would

23    just point out, Judge, that if you do credit the 911 caller,

24    as you appear to have done, that person called because he

25    explained that he was concerned about his kids who were there

1   with him and because Mr. Harris was causing trouble with

2   another guy while he had this gun on him.  So that is I think

3   a very serious incident to be doing that in the middle of a

4   street in Chicago next to a snow cone stand with presumably

5   other innocent people around, other families around, and it

6   sounds like kids were around.  And that is consistent with

7   Mr. Harris's behavior throughout the course of his criminal

8   case, including when Judge Feinerman violated him last time

9   for his gun violence and sentenced him to imprisonment.  So

10  that offense I think is very serious.

11          And as you noted, Judge, the MCC offense, I note it's

12  particularly serious.  Fighting somebody is always concerning.

13  But in a place like that at the MCC which can cause all kinds

14  of harm to do that, to think about it for two months, like you

15  said, Judge, while he's undergoing violation proceedings,

16  while he's had his bond revoked and he's been placed at the

17  MCC because he cannot comply with any of the rules and to do

18  that at the MCC, to create that kind of confrontational

19  situation, to put all those other people, the inmates and the

20  staff, in jeopardy like that, it just shows his complete

21  disregard for the rules and for being able to control his

22  actions.

23          And you already know, Judge, his criminal history so

24  I won't focus on that.  But then the last part is the focus of

25  the revocation proceeding and the sentence that the Court may

1  impose is to sanction the violation of the Court's orders.

2  And that is there's just so much here that shows that

3  Mr. Harris has had a complete disregard for your orders and

4  Judge Feinerman's orders.  As I mentioned, Judge Feinerman had

5  to revoke him already once and sentence him to imprisonment

6  which in my experience, Judge, is not very common in this

7  district.  Generally defendants get admonishments, they'll get

8  chances, and then they tend to do what they're supposed to do.

9  You know, I see it as different tiers in supervised release.

10  There's some defendants who are on supervised release who take

11  advantage of the resources that are offered to them to be able

12  to reintegrate into society because probation offers a lot of

13  resources to be able to do that because that is the purpose of

14  supervised release.  There's some defendants who just don't

15  take it seriously and blow it off.

16      And then there's Mr. Harris who in the period that I

17  have been on this case, his supervised release, he has -- that

18  has been an opportunity for him to continue to be a menace,

19  whether it's having a gun and getting into a fight on the

20  street or at the MCC or not complying with any of the

21  instructions that probation is providing, ignoring

22  admonishments by the Court, it's just been one thing after

23  another.  So when you're thinking about whether to -- how to

24  sanction his willful violations of court orders, I think

25  there's just a consistent pattern of refusing to do so.

1      And so for all those reasons, Judge, the government

2 recommends a sentence within the guideline range, and at least

3 a sentence greater than the one that Judge Feinerman imposed,

4 given the escalating nature of the conduct with respect to

5 Mr. Harris.

6      THE COURT:  All right.  Thank you.

7      Mr. Graham.

8      MR. GRAHAM:  Judge, I represented Mr. Harris since he

9 was 19 years old which is 16 years.  During the period that

10 Mr. Harris was out, he had a warehouse job.  He was being

11 promoted at various different times for more money and more

12 responsibility.  At one point he had a training program where

13 he was going to be learning how to run a forklift.  For a

14 sizable period of months, he was doing very well, and I

15 believe that he is capable of going back and doing that again.

16 He's been obviously very frustrated as a result.  And I'm not

17 saying it's an excuse, but he's been very frustrated about the

18 pandemic and what it has, you know, caused him in terms of

19 serving large periods of time in custody.

20      So a couple of things about that, Judge.  No. 1, no

21 one here in terms of the government or probation or myself are

22 looking to have Mr. Harris be put back on supervised release.

23 So I think we're all in agreement that --

24      THE COURT:  Hold on, Mr. Graham.  Let's see if we

25 can...

1    Okay.  Sorry.

2    MR. GRAHAM:  Whatever sentence Your Honor -- sanction

3  Your Honor has, basically it should be the end of Mr. Harris's

4  case here.

5    Judge, I was looking at my records.  I got appointed

6  on this case on 7/26/2020, and I think I went through nine

7  third-party custodians.  Some of those people had criminal

8  convictions.  Some of them had cases pending.  Some of them

9  were in Section 8 housing, all of which disqualified them from

10  being a third-party custodian.

11    From my records, Judge, I think she was in custody

12  from July until -- and I believe that he was released and we

13  dealt with the bond paperwork on 10/13/21 which is roughly 15

14  months.

15    Now, after that, he's out for a year, roughly.  And

16  during that time he obviously picked up a lot of violations.

17  But he was in custody in one form or another for this case I

18  believe originally for 15 months and then for another nine

19  months when he went into the Salvation Army and then over to

20  the MCC.  And that was roughly November, and now we're talking

21  July.

22    So as far as I can calculate that, it's 24 months.

23  And if you're asking me what we believe that the appropriate

24  sentence would be, it would be time considered served for

25  those 24 months.  I believe that the time that he spent in

1   custody, both over at Cook County Jail awaiting the UUW, due

2   to the fact he was found not guilty of it, and other time that

3   he was in federal custody, all of that should apply towards

4   this sentence.

5          THE COURT:  Putting aside the question of whether it

6   should count, what are the parties' perspectives on, you know,

7   this is always frequently an issue in understanding what

8   credit the Bureau of Prisons will give for time served.  The

9   time that he was originally in custody, let's see here.  He

10  was arrested on July 21st of 2020.  He was placed into state

11  custody at that time.  He remained in state custody until

12  January 14th of '21 when he posted bond in state court.

13         Now, typically that time in custody would not

14  necessarily be considered as time served by the BOP because he

15  was at that point in the primary jurisdiction of the state --

16         MR. DIDWANIA:  Your Honor --

17         THE COURT:  -- and until he was released from state

18  custody, you know, he was serving time in pretrial detention

19  for a state charge.  So I'm not sure how that plays out.

20         Mr. Didwania.

21         MR. DIDWANIA:  I just want to clarify, Judge, between

22  August of 2020 and January 14 of 2021, it's my understanding

23  that he was not in custody because of pretrial detention but

24  because of a parole violation.  His parole was violated for

25  getting that gun charge in the state.

1      THE COURT:  Oh, okay.  All right.  Well, and that

2  actually does matter because that time would be considered

3  time served against an existing state court sentence.  So that

4  time I think would not count as time served, would not be

5  credited by the BOP as time served on this -- on the

6  violations that I'm finding here.  Do you agree?

7      MR. DIDWANIA:  That would be my understanding, Judge.

8      PROBATION OFFICER:  Mine too as well, Your Honor.

9      MR. GRAHAM:  Judge, Mr. Harris is indicating that

10  when he had the parole board, they did not make a finding

11  against him.  But of course that took a period of time for him

12  to wait until that parole hearing took place.  He can speak to

13  that.

14      THE COURT:  Well, this disadvantages you, Mr. Harris.

15  If BOP isn't going to -- well, go ahead.  What do you have to

16  say?

17      THE DEFENDANT:  I was already violated before the gun

18  charge even came around and there was the parole board called.

19  I never was supposed to even have been on parole.  So I went

20  and did 120 days because of COVID-19.  It stretched me out

21  from seeing the parole board.  So I was only incarcerated for

22  four months with the state of Illinois.

23      THE COURT:  What four months?

24      THE DEFENDANT:  From August of 2020 to January

25  of 2021 and there was no more.  Everything else was a U.S.

1  marshal hold.  And the only reason why it was lengthy for

2  those months was because of COVID-19.  I was released from

3  state prison in 2019.  My parole was supposed to have been --

4  I can't recall the exact word for it, sir, but the only reason

5  I was doing that lengthy four months was because of COVID-19

6  and the parole board process was slow.

7          THE COURT:  Well, whatever the reason for it, I mean,

8  when you were arrested in this case, you were --

9          THE DEFENDANT:  I understand, sir, but that's only

10  four months out of the 15.  Everything else is because of the

11  U.S. marshal hold.

12          THE COURT:  Well, you weren't released from state

13  custody until January 14th of '21.  So between 7/21 of '20 and

14  1/14 of '21, which is about seven months -- six months.

15          THE DEFENDANT:  That's five months, sir, to be exact.

16          THE COURT:  August, September, October, November,

17  December, January, six months.

18          THE DEFENDANT:  August to January is six months, sir,

19  seriously?

20          THE COURT:  So from July 21 to January 14th -- or

21  excuse me -- July 21 of 2020 to January 14th of 2021, you were

22  in state custody.  You were transferred to federal custody --

23          THE DEFENDANT:  I was never transferred nowhere, sir.

24  I always had a U.S. marshal hold from start to the finish.  I

25  was in Cook County the whole time.

1    THE COURT:  I don't necessarily mean you were

2  physically transferred anywhere, but you were transferred --

3  after January 14th of 2021, the state was not trying to hold

4  you in custody.  You were held in custody by virtue of the

5  proceedings in this case.

6    MR. GRAHAM:  As for one other point, usually the

7  Bureau of Prisons, if they were going to calculate a time, as

8  long as Mr. Harris -- obviously he was found not guilty in

9  state court.  So that time, whatever time was calculated,

10  would not be attributed to another case because he was found

11  not guilty of the UUW in state court.

12    THE COURT:  Well, unless -- it would count as a --

13  toward time served to the extent he's been held for a parole

14  violation.

15    MR. GRAHAM:  I understand, Judge.

16    THE COURT:  Okay.

17    MR. GRAHAM:  I'm saying that there is other time that

18  obviously during that 15 months, let's say it's 11 months,

19  should be attributed to this case.

20    THE COURT:  I agree because -- well, for the most

21  part, he was in federal custody for the brief period he was

22  transferred back to state custody for purposes of the trial.

23  At that point he was in -- he was still in primary federal

24  custody, so I'm not sure -- regardless of the outcome of the

25  trial, I'm not sure that that time in state custody would

1    matter.  But particularly given the trial results, that time

2    doesn't count as time served on a state sentence.  There was

3    no state sentence.

4         All right.  I'm not sure how we got off on that

5    tangent.

6         MR. GRAHAM:  I think I took us off course.

7         THE COURT:  Okay.

8         MR. GRAHAM:  I mean, I think part of it, Judge, is

9    that regardless of what your sentence is that you should

10   attribute large blocks of time towards Mr. Harris's --

11   whatever your determination is today because he's been in

12   custody, and it's as a result of the federal hold.  So whether

13   it's 24 months or 18 months, we believe that Your Honor should

14   attribute that to any sentence that you impose today.

15        THE COURT:  Okay.  All right.

16        Mr. Harris, this is your opportunity to make any

17   statements you want to make.

18        THE DEFENDANT:  I mean --

19        THE COURT:  Actually, before you begin, I need to put

20   you under oath again.

21        Please raise your right hand.

22     (Defendant sworn.)

23        THE DEFENDANT:  I mean, Your Honor, honestly, as far

24   as the UUW, I kind of take accountability for trying to suck

25   up to a woman.  And I should have been more careful.  I should

1    have, you know -- I didn't know the weapon was in that purse.

2    You know, they got a big call from two of my friends.  I hear

3    their voices clear.  I explained this to my lawyer.  And we

4    was all chasing the girl.  You know, I guess I was trying to

5    do a little bit more sucking up to her.  I never went in her

6    purse.  That's why there's the POD camera right there.

7          And I'm not going to blame Mr. Graham for doing a

8    poor job because he's an attorney.  I'm not the only person he

9    fighting for.  But if he would have subpoenaed and got the

10   camera footage, I've been on camera the whole time.  I never

11   brandished a firearm at no one.  That's why the phone number

12   that the call come from is untraceable.  Mysteriously he could

13   never even give his address.  He called looking for a specific

14   police station.

15         But I accept responsibility.  That's one thing I

16   never did, Judge Tharp, is lie to you.  I got that much

17   respect, you know.  And I accepted responsibility for using

18   drugs.  You know, I was kind of weak minded.  You know, in

19   situations in life I felt like I could have been a little more

20   stronger, smoke some marijuana, you know, not knowing what

21   they sprayed on it.  So yeah, I take full responsibility for

22   that, being weak minded.

23         As far as the jail incident, it's amazing that this

24   man, he don't even know me, could draw up a story like this.

25   They went over the disciplinary hearing process of this whole

1   ticket at the jail.  I never got convicted of that ticket,

2   Your Honor.  I've been going through cruel and unusual

3   punishment for the last two months.  And I raised my hand,

4   Your Honor, if you can recall when I first met you when I

5   tried to forewarn you of this.  Now they blame this big story,

6   I started a fight, but they ain't go looking to my side.  I

7   brung you seven certificates in your courtroom to show you

8   that I've been programming is what they call it over there.  I

9   had a job since I been over there.  I cleaned the unit and I

10  was the staff orderly and I was the assistant counselor.  What

11  my job was, when inmates have a conflict, find a cell and

12  relocate the inmate until the counselor can do it.

13          Now, in the midst of this, Your Honor, I don't know

14  nobody in that jail I'm dealing with; but Ricky Price, we kind

15  of related.  That's why he stated in black and white that me

16  and James was fighting, but he ain't do no harm to me like

17  stab me or none of that because everybody rushed in a room.

18  If you could see the video, you really can't even see because

19  I looked at the video as clear as you.  I didn't cause no harm

20  on no one like that.  But they didn't tell you how the back of

21  my head was split open with a lock and I was denied medical

22  attention.  But I'm not here to cry about that, Your Honor.  I

23  put my faith in your hands to have a great judgment.

24          And my mother, both of my uncles, they was my

25  rappies.  They was my co-defendants.  I been -- all I knew was

sell drugs all my life.  I never had a dangerous crime in my

background as you can see.  You can look me up.  I mean, never

had a victim on my crimes.  I was just convicted of drug

dealing, and I admit that.

Speaking out of fear, knowing peoples and situations

in my life where you get guns off the streets, you know, you

get out of the back door, I had a parole warrant.  I didn't

lie about that.  But they sit up in here and trying to make me

out of a monster, Your Honor.  They don't even know me.  I met

my parole officer.  I never even met my probation officer.

She gave me a call when they switched me from Tony Moore to

her, she basically came out threatening me.  She basically --

like she started hating me when I went over her head to get my

driver's license for the first time in my life.  I'm 34 years

old.  And it took me an hour and a half to get my license and

I reported back home.  After since then she started filing

minor violations about me coming in the house late, five or

ten minutes late.  But she don't tell you there's a shooting

on my block.  Every time you turn around somebody dying.  So

yeah, I be having to watch before I come home.  I be a little

scared.

And I admit to my violations.  I'm not here to lie.

That's one thing I'm not going to do.  I'm not going to.  I'm

scared of God.  I'm too scared of Him to sit up in here and

lie to you, Your Honor.  I accept full responsibility for

1  carrying that bag and not looking in it, trying to respect
2  this woman.

3          I never possessed that weapon.  They took
4  fingerprints and DNA.  Now, mine is not on it.  I ain't -- why
5  would I possess a registered firearm?  I'm competent enough to
6  know better.  I'm competent enough to know that there's a
7  camera, a POD camera rolling around here.  I didn't just meet
8  LaDonna Crawford.  Everybody in our neighborhood know she a
9  diabetic so she fragile.  That's how I knew she had the
10  insulin because I always see her use it.

11          But, Your Honor, I don't know.  After this I want to
12  go to Florida with my sister.  It's kind of slower.  I've been
13  there before.  She willing to accept me.  I talked to her.
14  But whatever sentence you impose today, sir, I just hope you
15  take into consideration that even though, you know, like you
16  said, I believe, Mr. Harris, you had that gun, yeah, I had the
17  bag.  The gun was in the bag.  I didn't know that gun was in
18  that bag.  I never possessed that gun.  I never picked that
19  gun up, none of that.  I never threatened no one with a
20  weapon.  They didn't even have a witness to come to court.
21  The man on the call couldn't even produce his address.  He
22  stuttering.

23          And then if you listen to the call, Your Honor, it's
24  two people talking, Andy Moore (phonetic) and Deante Moore
25  (phonetic).  I grew up with them my whole entire life.  I got

1   cases with them in the state.  I told this to my attorney,

2   both attorneys.  The state of Illinois didn't want to use the

3   police call.  I wanted to.  The state didn't want to use that

4   police call in the court system.  I wanted to.  My lawyer said

5   just go -- let's just go to trial.

6          I mean, I'm in jail, Your Honor.  Like I'm not

7   violent.  Why does they bring up this ticket?  I'm the only

8   one going to court for this.  I'm the only one out of all

9   those dudes that was in that room, the Curtis Harrises and

10  Ricky Prices and ain't nobody else charged.  Ain't nobody else

11  going in front of their judge to hear about none of this but

12  me.  They try to make me out of a monster.

13         Sometimes it's frustrating, Your Honor.  It's been

14  very frustrating.  I've been going through a lot in that

15  building.  I got an important surgery coming up that I've been

16  chickening out for for a few years because I'm scared.  I've

17  been under too much anesthetics for gunshot wounds in my life.

18  They said it's a possibility I might not wake up, but I got to

19  have the procedure.

20         So -- and I apologize if I ever offended you at any

21  way with any outburst or anything, Your Honor.  It's just I'm

22  a human, and I'm -- sometimes I get a little frustrated and

23  I'll take full responsibility for that.

24         So whatever sentence you impose on me today,

25  Your Honor, I'm going to trying to make the best of it, and

1  I'm going to serve my time constructively if I have to do

2  anymore.  But I would beg you to please remove me from the MCC

3  building if I have to because it's a lot of things,

4  Your Honor, that's going on in that building.  I write BP-8s

5  and BP-9s.  They won't even let me bring you the paperwork

6  that I got.  They won't let me bring my paperwork to court.

7  They won't let me bring my paperwork to court to show you

8  what's going on on my behalf.  Probation, my probation

9  supposed to have been over with in March.

10       I'm not mad at Mr. Graham once again.  Because he's

11  an attorney.  I'm not the only person he's fighting for.  So

12  it's like, okay, they said I was in state custody.  You add

13  that on to that March out date, my probation still supposed to

14  be over with.  But my probation officer, she get frustrated

15  too, like me I guess, and she's been very disrespectful to my

16  attorney, to me, my family, very disrespectful.  Sometimes she

17  don't even know how to hold her composure, too.

18       But I'm not -- you know, I tried to work a job.  My

19  first time ever getting a job, I was 34 years old.  I travel

20  three hours to work, work a 12-hour shift, and travel three

21  hours from work.  I was a machine operator.  I was making like

22  $22 an hour.  I took pride in that because I was a machine

23  operator.  I had to learn books and things of that nature, and

24  there's a career in this.  And I still got those accolades

25  under my belt to continue on in life.  I got job opportunities

1   waiting on me right now.  My biggest thing is getting my CDL.

2   I wanted to get this bad.  I couldn't get it at the time

3   because in the state of Illinois you got to have a valid

4   driver's license for 12 months, and I just got my license when

5   I was released out on third-party bond.  That was my first

6   time getting my license.  I tried in 2020 when Morgan Calhoun

7   crossed over to be my probation officer, I didn't have any

8   credentials.  I tried, but COVID-19 had the world at a

9   standstill.

10          They tried to make me out of a monster.  But I got

11  faith in God, and that's all I would like to say, Your Honor.

12          THE COURT:  All right.  We're addressing two grade B

13  violations that the Court has found of the terms and

14  conditions of supervised release.  The sentencing guideline

15  range is 21 to 27 months.  That would be the range applicable

16  if there was only one violation as well.  Here we have at

17  least two violations, the firearm violation and the Salvation

18  Army violation.

19          We also have the other factors that bear on the

20  appropriate sentence to impose, the conduct reflected in the

21  MCC fight, Mr. Harris's utterly abysmal compliance with

22  location monitoring, his prior history of supervised release

23  revocation, the fact that, as Mr. Graham points out, I think

24  everyone here is in agreement that a further term of

25  supervised release is not an appropriate sentence in this case

1  given the demonstrated inability of Mr. Harris to comport with

2  the conditions of supervised release.

3  That's relevant.  Mr. Harris may celebrate that, but

4  it's also relevant to the Court's consideration of the

5  appropriate term of imprisonment to impose because often

6  defendants may get some discount on a sentence of imprisonment

7  on the thought that they'll have the opportunity to

8  demonstrate on supervised release that they can and will abide

9  by lawful conduct.  But Mr. Harris has demonstrated repeatedly

10 that that is not a reasonable inference, and that counsels for

11 a higher sentence.

12 Mr. Harris, you said repeatedly that you're accepting

13 responsibility for your conduct, but you're not accepting

14 responsibility for your conduct.  No one is making you out to

15 be a monster here.  You are responsible for your conduct.  You

16 are responsible for your criminal record.  You are responsible

17 for what is, in my 11 years on the bench, the most abysmal

18 performance on supervised release of any defendant that's been

19 assigned to my docket.  You've used -- rather than actually

20 accepting responsibility for your conduct, you're still

21 denying your conduct.  You're still blaming others, ranging

22 from Mr. Graham, to probation, to the government, to the MCC

23 staff.

24 THE DEFENDANT:  Excuse me, Your Honor.

25 THE COURT:  No, you've had your opportunity.

1    The Court factors all of these consideration into

2  account in assessing the appropriate sentence to impose here.

3  I don't believe that a sentence within the guideline range of

4  21 to 27 months is adequate here.

5    I'm going to impose a sentence of 36 months.  I'm

6  going to impose that sentence on Count One, and I'll impose

7  the sentence of 24 months on Count Two, those sentences to

8  run -- well, I don't have to impose it on each individual

9  count.  So the sentence will be 36 months of imprisonment.  No

10  supervised release will follow.

11    For the record, some significant portion of that

12  36 months should count as time served on that sentence.  At a

13  minimum, it would appear that from January 14th of 2021 to

14  October 13th of 2021, a nine-month period, and the period from

15  November 16th of 2022 to the present, another eight months, at

16  a minimum, the Court believes that those time periods, that

17  17 months, would be credited by the Bureau of Prisons to time

18  served against this sentence.

19    To the extent there is other time period that may or

20  may not be credited by the BOP, you know, they will make that

21  determination based on their review of the records, the

22  appropriate records.  But in the Court's view, there's about

23  17 months of time served, and an additional premium above that

24  remains to be served, and that's appropriately so.  If the

25  Bureau of Prisons credits additional time served, that will

1    effectively shorten Mr. Harris's additional time of

2    imprisonment, but the maximum it would seem that additional

3    time of imprisonment would be 19 months, coupled with the

4    17 months of time served would equal the 36 months.

5         So that is the sentence the Court deems to be

6    appropriate given the conduct that's been established and the

7    findings of the Court with respect to that conduct.

8         Ms. Calhoun, is there anything else from the

9    standpoint of the sentence and the structure of the sentence

10   that I need to address?

11        PROBATION OFFICER:  Your Honor, I do think that we

12   have to -- we can do the 24 months on Count Two to run

13   concurrently because he had two counts when he first initially

14   was --

15        THE COURT:  All right.  So we do need to marry up the

16   sentence to the counts.

17        PROBATION OFFICER:  Right.

18        THE COURT:  All right.  So it will be 36 months on

19   Count One, 24 months Count Two, those sentences to run

20   concurrently.

21        PROBATION OFFICER:  Thank you, Your Honor.

22        THE COURT:  All right.

23        Mr. Didwania, anything else I need to address from

24   the government's perspective?

25        MR. DIDWANIA:  Nothing else from the government,

1  Your Honor.

2        THE COURT:  All right.  Mr. Graham?

3        MR. GRAHAM:  Judge, I guess two things.

4        No. 1, question on the 500-hour comprehensive drug

5  treatment program.  If Your Honor would recommend it, it's

6  possible that the Bureau of Prisons would accept him and he

7  could go into that program.

8        THE COURT:  By the 500 hours, are you referring to

9  RDAP?

10        MR. GRAHAM:  Right, yes, Judge.

11        THE COURT:  Okay.  There's certainly plenty of

12  indications for the need for RDAP.  I don't think that

13  Mr. Harris will qualify given that he's only got 19 months

14  left at most to serve on this sentence, but I'm happy to make

15  the recommendation.

16        MR. GRAHAM:  Sure.  If I could have one more minute.

17     (Off the record.)

18        MR. GRAHAM:  No recommendations in terms of a

19  facility, Judge.

20        THE COURT:  Okay.  Then we're adjourned.

21        PROBATION OFFICER:  Thank you, Your Honor.

22        MR. GRAHAM:  Thank you.

23     (Off the record.)

24        THE COURT:  We're back on the record.  I'm sorry.  I

25  did neglect one thing to put on the record.

1    Mr. Harris, you have the right to appeal the Court's

2    decision.  Any appeal must be initiated by filing a notice of

3    appeal in this district court within 14 days of the entry of

4    the revocation judgment on the record.  That revocation

5    judgment will likely be entered today.  Mr. Graham can

6    continue to advise you with respect to your rights to appeal,

7    but, again, I'm required to advise you, you do have the right

8    to appeal, but any appeal must be initiated within 14 days by

9    filing a notice of appeal.

10    We're adjourned.

11    MR. DIDWANIA:  Your Honor, if I could have one

12    question which I forgot to ask.  You imposed a sentence of

13    36 months of imprisonment and noted that -- your belief about

14    what the BOP would credit.  Would your sentence be the same if

15    the BOP credited a different amount, such as a lower amount?

16    THE COURT:  Yes.  Yes.  I at least tried to address

17    that point.  To the extent -- I think at a minimum the BOP --

18    I'm right that the BOP will credit 17 months in the two

19    periods that I indicated.  If the BOP credits more than that

20    time, then that's going to work to Mr. Harris's advantage and

21    shorten the remainder of his period of release.

22    If the BOP doesn't credit the time that I have

23    indicated, that's not going to change the sentence.  But I'm

24    operating on the best information that I have that that time

25    would be considered time served, and I'm going to indicate my

1 reasoning for that on the judgment order.

2 MR. GRAHAM: Judge, Your Honor's sentence is above

3 the guidelines. And I'm just asking, is everything on the

4 record in terms of what Your Honor was thinking as to why it

5 is that a guideline above the sentencing guidelines should be

6 appropriate?

7 THE COURT: Yes. As I indicated, the abysmal

8 performance on supervised release, the violations that I had

9 found, and the fact that Mr. Harris continues not to accept

10 responsibility for his conduct all factor -- I mean,

11 everything that I indicated are collectively the reasons that

12 I'm imposing this sentence. I don't think that a sentence of

13 27 months is adequate to promote the sentencing factors under

14 3553(a) as they are relevant in the context of this revocation

15 proceeding.

16 All right. So if the Bureau of Prisons calculates

17 time served differently, we've done the best we can to figure

18 that out but it's not going to affect my view that a

19 three-year sentence is the appropriate sentence to impose for

20 the conduct that Mr. Harris has been found guilty of in the

21 context of this revocation proceeding. All right.

22 Anything else?

23 MR. GRAHAM: No, Judge.

24 THE COURT: All right.

25 Thank you.

1      MR. DIDWANIA:  Thank you.

2      PROBATION OFFICER:  Thank you, Your Honor.

3    (Which were all the proceedings heard.)

4

5                    CERTIFICATE

6    I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.

8  */s/Kelly M. Fitzgerald*              *August 24, 2023*

9  _____      _____

   Kelly M. Fitzgerald                     Date
10 Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 1

# UNITED STATES DISTRICT COURT
Northern District of Illinois

UNITED STATES OF AMERICA

v.

**JAMES HARRIS**

**JUDGMENT IN A CRIMINAL CASE**
(For **Revocation** of Probation or Supervised Release)

Case Number: **1:11-CR-00667(5)**
USM Number: **21190-017**
**James A. Graham**
Defendant's Attorney

**THE DEFENDANT:**

☒ admitted guilt to violation of condition(s) Discretionary Condition #11 of the term of supervision.

☒ was found in violation of condition(s) Mandatory Condition #1 after a denial of guilt.

The defendant is adjudicated guilty of these violations:

| Violation Number | Nature of Violation | Violation Ended |
|---|---|---|
| 1 | The defendant shall not commit another federal, state, or local crime. | 7/21/2020 |
| 8 | You shall participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons Salvation Army) for all or part of the term of supervised release, for a period of up to 120 days. | 11/10/2022 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has not violated condition(s) _____ and is discharged as to such violation(s) condition.

☐ Count(s) _____ dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Last Four Digits of Defendant's Soc. Sec.: **6091**

Defendant's Year of Birth: **1987**

City and State of Defendant's Residence: **Chicago, Illinois**

**July 14, 2023**
Date of Imposition of Judgment

_____
Signature of Judge

**John J. Tharp, United States District Judge**
Name and Title of Judge

7/17/23
Date

A37

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 2 – Imprisonment

Judgment – Page 2 of 6

DEFENDANT:  JAMES HARRIS
CASE NUMBER: 1:11-CR-00667(5)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

**36 months as to Count One; 24 months as to Count 2, to run concurrently. The Court anticipates that the BOP will credit as time served 1/14/21-10/13/21 and 9/16/22 to present but if those periods are deemed not to count as time served, the sentence will not change.**

☒      The court makes the following recommendations to the Bureau of Prisons: Defendant participate in RDAP.

☒      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

      ☐  at        ☐  a.m.   ☐  p.m.  on

      ☐  as notified by the United States Marshal.

☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

      ☐  before 2 p.m. on
      ☐  as notified by the United States Marshal.
      ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at _____,
with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
     DEPUTY UNITED STATES MARSHAL

**A38**

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 6 – Schedule of Payments                                           Judgment – Page 8 of 8

DEFENDANT: JAMES HARRIS
CASE NUMBER: 1:11-CR-00667(5)

# SUPERVISED RELEASE

Upon release from imprisonment, you shall be on supervised release for a term of:
~~No Term of Supervised Release Imposed.~~

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☐ (1) you shall not commit another Federal, State, or local crime.
- ☐ (2) you shall not unlawfully possess a controlled substance.
- ☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]
- ☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913)**.
- ☐ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☐ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D)**; such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D)**; and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**. The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☐ (1) you shall provide financial support to any dependents if you are financially able to do so.
- ☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows: ▓▓▓
- ☐ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) ▓▓▓
- ☐ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
  - ☐ visit the following type of places: ▓▓.
  - ☐ knowingly meet or communicate with the following persons: ▓▓▓.
- ☐ (7) you shall refrain from ☐ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐           ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act **(21 U.S.C. § 802)**, without a prescription by a licensed medical practitioner.
- ☐ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.
- ☐ (9) ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may

**A39**

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 2 – Imprisonment

Judgment – Page 4 of 6

DEFENDANT: JAMES HARRIS
CASE NUMBER: 1:11-CR-00667(5)

include urine testing up to a maximum of 104 tests per year.

☐    you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.

☐    you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify: ▨.)

☐   (10)   (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ▨ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ▨.

☐   (11)   (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ▨ months.

☐   (12)   you shall work in community service for ▨ hours as directed by a probation officer.

☐   (13)   you shall reside in the following place or area: ▨, or refrain from residing in a specified place or area: ▨.

☐   (14)   you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☐   (15)   you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☐   (16)   ☐    you shall permit a probation officer to visit you ☐ at any reasonable time or ☐ as specified:      ,
       ☐ at home     ☐ at work     ☐ at school     ☐ at a community service location
       ☐ other reasonable location specified by a probation officer
    ☐    you shall permit confiscation of any contraband observed in plain view of the probation officer.

☐   (17)   you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☐   (18)   you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐   (19)   (home confinement)

    ☐    (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.

    ☐    (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.

    ☐    (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.

    ☐    from the times directed by the probation officer; or ☐ from __ to __.

    ☐    (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.

    ☐    (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐   (20)   you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐   (21)   (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☐   (22)   you shall satisfy such other special conditions as ordered below.

☐   (23)   You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)),

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 2 – Imprisonment

Judgment – Page 5 of 6

DEFENDANT:  JAMES HARRIS
CASE NUMBER: 1:11-CR-00667(5)

other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24) Other:

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

### During the term of supervised release:

☐ (1) if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2) you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐ (3) you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least _____ hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed _____ hours.

☐ (4) you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☐ (5) you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☐ (6) you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☐ (7) within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☐ (8) you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9) you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

 ☐ You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

 ☐ The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

 ☐ You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

 ☐ You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

 ☐ You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2)**, regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

 ☐ You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops,

A41

ILND 245D (Rev. 03/12/2020) Judgment in a Criminal Case for Revocation
Sheet 2 – Imprisonment

Judgment – Page 6 of 6

DEFENDANT: JAMES HARRIS
CASE NUMBER: 1:11-CR-00667(5)

                playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

☐    This condition does not apply to your family members:      [Names]

☐    Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity. You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐    You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐    You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☐  (10)   you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☐  (11)   you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐  (12)   you shall pay to the Clerk of the Court $      as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to      (list both Agency and Address.)

☐  (13)   if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐  (14)   You shall observe one Reentry Court session, as instructed by your probation officer.

☐  (15)   Other:

**A42**

# CRIMINAL DISPOSITION SHEET

| Sheet #<br>0008 | Defendant Sheet #<br>0001 OF 0001 | | Branch/Room/Location<br>1722 203<br>100 CHICAGO POLICE DEPT | | | |
|---|---|---|---|---|---|---|
| CASE NUMBER<br>16CR1592401 | DEFENDANT NAME<br>HARRIS, JAMES | | ATTORNEY<br>KUSAITZKY MARK H | | | CLERK USE ONLY<br>0006 |
| CB/DCN #<br>01937 6708 | IR #<br>1395923 | EM | BOND # | I | C | D | COURT DATE<br>02-22-2018 | COURT CALL/TIME<br>2-0930 AM |

| CHARGES | * IN CUSTODY 01/26/18* | COURT ORDER ENTERED | | BOND AMOUNT | CODE |
|---|---|---|---|---|---|

**CHARGES**

C001 720-570/401 (A) (1) (A)
~~MFG/DEL~~ 15<100 GR HEROIN/ANLG
PCS

C002 720-570/401 (A) (1) (A)
MFG/DEL 15<100 GR HEROIN/ANLG

C003 720-570/401 (D) (I)
OTHER AMT NARCOTIC SCHED I&II

C004 720-570/401 (D) (I)
OTHER AMT NARCOTIC SCHED I&II

**COURT ORDER ENTERED (handwritten):**

Amended to Class I PCS — Count I

Δ PCFS; JW/PSI(W)/1YR; 5 years IDOC;
514 day TCS TBS; 2 years MSR; $0.

Counts 2-4
MSNP DT

RESPONSIBLE FOR CODING AND COMPLETION BY DEPUTY CLERK:
C. Edwards

VERIFIED BY:

JUDGE: (signature)
CAROL M. HOWARD
JUDGE'S No.

**CODES (handwritten):**
890
399
44
446
431
503
516
524
232
800
941
592
103
913

A42

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF COOK       )

FILED
JUDGE CAROL M. HOWARD-1928
FEB 22 2018
DOROTHY BROWN
CLERK OF CIRCUIT COURT

The OCTOBER 2016 Grand Jury of the
Circuit Court of Cook County,

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about September 26, 2016 at and within the County of Cook

James Harris

committed the offense of    POSSESSION OF CONTROLLED SUBSTANCE ~~WITH~~
~~INTENT TO DELIVE~~R

in that HE, UNLAWFULLY AND KNOWINGLY POSSESSED ~~WITH INTENT TO DELIVER~~
OTHERWISE THAN AS AUTHORIZED IN THE ILLINOIS CONTROLLED SUBSTANCES ACT OF
SAID STATE OF ILLINOIS THEN IN FORCE AND EFFECT, 15 GRAMS OR MORE BUT
LESS THAN 100 GRAMS OF A SUBSTANCE CONTAINING A CERTAIN CONTROLLED
SUBSTANCE, TO WIT: HEROIN,

IN VIOLATION OF CHAPTER 720 ACT 570 SECTION 402(a)(1)(A) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

                    COUNT NUMBER 1
                    CASE NUMBER 16CR-15924
                    CHARGE ID CODE: 5095020

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**THE PEOPLE OF THE STATE OF ILLINOIS**

(or Municipality of: _____ )

                                                          **Plaintiff,**

                    **vs.**

_____

_____ James Harris

_____

                                                          **Defendant.**

Charge for _PCS w/in (Class 1)_

_____

No. _16 CR 15924_

FILED
JUDGE CAROL M. HOWARD-1928
FEB 22 2018
DOROTHY BROWN
CLERK OF CIRCUIT COURT

I, the undersigned, do hereby waive jury trial and submit the above entitled cause to the Court for hearing.

Dated: _____ 2/22 , 2018

Signed: X _James J. Harris_

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**THE PEOPLE OF THE STATE OF ILLINOIS**

vs.

_James Harris_

} Charge _PCS (class 1.)_

No. _16 cc 15524_

FILED
JUDGE CAROL M. HOWARD · 1928
FEB 22 2018
DOROTHY BROWN
CLERK OF CIRCUIT COURT

    I the undersigned, do hereby waive my rights to a Pre-Sentence Investigation and written report as provided in 730 ILCS 5/5-3-1.

Signed _James J. Harris_

Dated: _2/22, 18_

STATE OF ILLINOIS } ss:
COUNTY OF COOK }

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS

v.

James Harris

Defendant

No. 16 CR 15927

## ORDER

This matter coming to be heard at Defendant's sentencing, all parties having due notice, and the court being fully advised of the premises,

IT IS HEREBY ORDERED:

Defendant is credited for the following time served while in pretrial custody in this case:

from 9/26/16 thru 2/22/18 = 514 days

from _____ thru _____ = _____ days

from _____ thru _____ = _____ days

from _____ thru _____ = _____ days

from _____ thru _____ = _____ days

from _____ thru _____ = _____ days

TOTAL DAYS = 514

ENTERED
JUDGE CAROL M. HOWARD - 1928
FEB 22 2018
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT

Defense attorney: MARK KUSATZKY

Asst. State's Attorney: _____

Atty. No.: 1892
Name: Mark H Kusatzky
Atty. for: Def
Address: 181 Waukegan RM #301
City/State/Zip: Northfield IL 60093
Telephone: 847-441-5050

Date: 2/22/18 , _____

A47

Judge (signature) 1928

Judge                    Judge's No.

Order Assessing Fines, Fees and Costs                                    (Rev. 03/16/16) CCG N680

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS

        or

_____

A Municipal Corporation

v.

*James Harris*

Defendant

☐ Municipal District/Br. or Rm. **203**
or ☑ Criminal Division

Case No. **16 CR 15924**

Charge **PCS 15-100g her**

Arrest/Indictment Date **9/26/18**

Note: Items with a diamond (♦) are mandatory per statute.

### ORDER ASSESSING FINES, FEES AND COSTS

This cause coming to be heard before the Court for the assessment of fines, fees, costs, reimbursements and other monetary penalties;

**IT IS HEREBY ORDERED** that assessments in the amount indicated below and a monetary judgment on the Court ordered assessments are entered as follows:

**FINES OFFSET by the $5 per-day pre-sentence incarceration pursuant to 725 ILCS5/110-14(a):**

| | | |
|---|---|---|
| Other as ordered by the court: _____ | 3010 | _____ |
| Felony Offense Fine,730 ILCS 5/5-9-1(a); 730 ILCS 5/5-4.5-50(b) (not to exceed $25,000 or amount specified in offense; $50,000 if corporation) | 2004 | _____ |
| Misdemeanor Offense Fine, 730 ILCS 5/5-9-1a); 730 ILCS 5/5-4.5-55(e), 60(e), 65(e) (Class A not to exceed $2,500 or amount specified in offense Class B & C $ 1,500) | 2005 | _____ |
| Theft/Deceptive Practice Fine, 730 ILCS 5/5-9-1.3 (the greater of $25,000 or twice the value of the property ) | 3008 | _____ |
| Theft/Deceptive Practice Fine, 730 ILCS 5/5-9-1.3 (the greater of $25,000 or treble the value of the property if local government or school district and 33C-1-33C4, or 33E-3-33E-18) | 3008 | _____ |
| ♦ Mental Health Court, 55 ILCS 5/5-1101(d-5) | 2012 | ☐ $10 |
| ♦ Youth Diversion/Peer Court, 55 ILCS 5/5-1101(e) | 2014 | ☐ $5 |
| ♦ Drug Court, 55 ILCS 5/5-1101(f) | 2016 | ☐ $5 |
| ♦ Children's Advocacy Center, 55 ILCS 5/5-1101(f-5) | 2017 | ☐ $30 |
| Local Anti-Crime Program Contribution, 730 ILCS 5/5/-6-3.1(c)(13) (supervision, not to exceed max. amount of offense fine) | 2001 | _____ |
| ♦ Fine to Fund Juvenile Expungement (ISP/State's Attorney/Clerk), 730 ILCS 5/5-9-1.17 (criminal offense plea/finding of guilty) | 6027 | ☐ $30 |
| ♦ Streetgang Fine,730 ILCS 5/5-9-1.19 (Criminal conviction if street gang member) ($95 is fine subject to credit $5 is fee) | 6029 | ☐ $95 + $5 |
| ♦ Serious Traffic Violation, 625 ILCS 5/16-104d (expires 1/1/2020) ($30 is fine subject to credit, $5 is fee) | 6018 | ☐ $30 + $5 |
| ♦ False Information to Secretary of State, Title or Registration, 625 ILCS 5/3-712(a) | 6020 | ☐ $500 |
| ♦ False Information to Secretary of State, Military License Plates, 625 ILCS 5/3-712(b) | 6021 | ☐ $1000 |
| ♦ Traffic Court Supervision, 625 ILCS 5/16-104c ($9.50 is fine subject to credit, $25.50 is fee) | 3012 | ☐ $9.50 + $25.50 |
| ♦ Uninsured Motor Vehicle Fine, 625 ILCS 5/3-707(c), (c-5) ($501-$1,000; $100 if insured by court date) | 2010 | _____ |
| ♦ Registration Suspended for Noninsurance Fine, 625 ILCS 5/3-708 ($1,000-$2,000) | 2025 | _____ |
| ♦ Additional Violation of Parole Fine, 730 ILCS 5/5-9-1-1.20 ($20 is fine subject to credit, $5 is fee) | 6032 | ☐ $20 + $5 |
| ♦ Conservation Police Operations Assistance, 705 ILCS 105/27.3a-1.6 | 6034 | ☐ $15 |
| ♦ Disability License Plates or Decal Fine, 625 ILCS 5/11-1301.3 (c-1) | 6035 | ☐ $2500 |
| ♦ State Police Merit Board Public Safety Fine, 20 ILCS 2610/7.2 | 6036 | ☐ _____ |
| ♦ Human Trafficking Fund Fine, 720 ILCS 5/10-9(g-5) | 6040 | _____ |
| ♦ Timber Buying Licensing Act Fine, 225 ILCS 735/11 | 6038 | ☐ _____ |
| ♦ State Police Operations Fee, 705 ILCS 105/27.3a-1.5 | 6028 | ☐ $15 |

**DUI OFFENSES**

| | | |
|---|---|---|
| ♦ DUI Offense Fine, 625 ILCS 5/11-501(c), (d)(2)(B),(E), (I) and 730 ILCS 5/5-4.5-55(e) | 3013 | _____ |
|   Mandatory min. BAC. 16 and above : 1st offense $500, 2nd offense $1,250, 3rd offense $2,500, 4th or more offense $5,000 | | |
|   Mandatory min. transport child under 16: 1st offense $1,000, 2nd offense $2,500, 3rd or more offense $25,000 | | |
|   Mandatory min. accident bodily harm to child under 16 transported: 1st offense $2,500, 2nd offense $5,000 | | |
| ♦ DUI Law Enforcement, 1st offense 625 ILCS 5/11-501.01(f)($350 is fine subject to credit, $400 is fee) | 3006 | ☐ $350 + $400 |
| ♦ DUI Law Enforcement, Subsq. Offense, 625 ILCS 5/11-501.01(f)($200 is fine subject to credit, $800 is fee) | 3007 | ☐ $200 + $800 |
| ♦ Court System, 55 ILCS 5/5-1101(d) (for 2nd and subsq. violations of 11-501 or similar local ordinance) | 3014 | ☐ $100 |
| ♦ Emergency Response Penalty, 625 ILCS 5/16-104a(b), (11-503 or 11-601.5) (separate restitution order required with name(s) and address(es) of each emergency response agency), 1st offense, $100 per agency | 3016 | _____ |
|   2nd or subsq. offense $500 per agency | 3017 | _____ |
| ♦ Roadside Memorial Fund Fee, 605 ILCS 125/20(f) (Supervision/Conviction of 11-501, 730 ILCS 5/5-9-1.18 may be waived if full restitution) | 6022 | ☐ $50 |

**DOMESTIC VIOLENCE OFFENSES**

| | | |
|---|---|---|
| ♦ Domestic Violence Fine, 730 ILCS 5/5-9-1.5 | 6008 | ☐ $200 |
| ♦ Protective Order Violation Fine, 730 ILCS 5/5-9-1.16 (not less than $200) | 2019 | _____ |

**CONTROLLED SUBSTANCE/CANNABIS/HYPODERMIC NEEDLES OFFENSES**

| | | |
|---|---|---|
| Controlled Substance Manufacture or Possession Fine, 720 ILCS 570/401 or 402 | 2003 | _____ |
| ♦ Street Value of Seized Drugs Fine, 730 ILCS 5/5-9-1.1(a) | 2021 | _____ |
| ♦ Methamphetamine Street Value of Seized Drugs Fine, 730 ILCS 5/5/-9-1.15(a) | 2022 | _____ |
| ♦ Methamphetamine Law Enforcement Fund, 730 ILCS 5/5-9-1.1-5(b) | 6016 | ☐ $100 |
| ♦ Meth-related Child Endangerment Fine, 720 ILCS 646/50 | 2026 | ☐ _____ |

A-48

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Page 1 of 3

Case No. 16CR15924

**CONTROLLED SUBSTANCE/CANNABIS/HYPODERMIC NEEDLES OFFENSES (Cont.)**

♦ Drug Traffic Prevention Fund, 730 ILCS 5/5-9-1.1(e) _____ 6025 ❑ $25

♦ Methamphetamine Drug Traffic Prevention Fund, 730 ILCS 5/5-9-1.1-5(c) _____ 6030 ❑ $25

♦ Controlled Substance Fine, 720 ILCS 570/411.2(a) (Class X $3,000, Class 1 $2,000, Class 2 $1,000, Class 3 or 4 $500, Class A $300, Class B or C $200) _____ 3002 *2,000*

♦ Cannabis Fine, 720 ILCS 550/10.3 (Class X $3,000, Class 1 $2,000, Class 2 $1,000, Class 3 or 4 $500, Class A $300, Class B or C $200) _____ 3001

♦ Meth Emergency Response Fine, 720 ILCS 646/90(c), 1st Offense ($2,475 is fine subject to credit, $25 is fee) _____ 3022 ❑ $2,475 + $25

♦ Meth Emergency Response Fine, 720 ILCS 646/90(c), Subseq. Offense ($4,950 is fine subject to credit, $50 is fee) ___ 3023 ❑ $4,950 + $50

♦ Prescription Pill and Drug Disposal Fund/Criminal Justice Information Projects Fund, 730 ILCS 5/5-9-1.1(f), 730 ILCS 5/5-9-1.1-.5(d) ($38 is fine subject to credit, $2 is fee) _____ 6033 ❑ $38 + $2

♦ Trauma Center Fund, 730 ILCS 5/5-9-1.1 (b)(drug-related offense: cannabis, possession/delivery controlled substance) _ 6031 ❑ $100

♦ Criminal Justice Information Projects Fund, 730 ILCS 5/5-9-1.1(e) _____ 6041 ❑ $25

## FINES NOT OFFSET BY THE $5 PER-DAY PRE-SENTENCE INCARCERATION CREDIT:

Other as ordered by the court: _____ 3010 _____

♦ Violent Crime Victim Assistance, 725 ILCS 240/10(c)(1) or (2) where no other fine is imposed: ($25 crimes of violence; $20 all other felony or misdemeanor) _____ 6012 *20*

♦ Violent Crime Victim Assistance, 725 ILCS 240/10(b) ($100 felony, $75 misdemeanor, or $50 misdemeanor traffic) ___ 6012 _____

♦ Criminal/Traffic Conviction Surcharge/LEADS Fund, 730 ILCS 5/5-9-1(c) ($10 per $40 of fine) _____ 6010 _____

**SEX OFFENSES**

♦ Child Pornography Fine, 730 ILCS 5/5-9-1.14 (child pornography conviction) _____ 3015 ❑ $500

♦ Sex Offender Fine, 730 ILCS 5/5-9-1.15 _____ 6023 ❑ $500

♦ Sexual Assault Fine, 730 ILCS 5/5-9-1.7(b)(1) (supervision/conviction sex assault or attempt) _____ 6009 ❑ $200

**DUI OFFENSES**

♦ Spinal Cord Injury Paralysis Cure Research Trust Fund, 730 ILCS 5/5-9-1 (c-7) (DUI supervision) _____ 6004 ❑ $5

♦ Trauma Center Fund, 730 ILCS 5/5-9-1 (c-5) (DUI supervision/conviction) _____ 6003 ❑ $100

♦ Court System, 55 ILCS 5/5-1101(a) _____ 2013 ❑ $30

♦ Non-police chemical or blood test by: _____

                Facility Name                 Address                 Telephone

  625 ILCS 5/11-501.01(j) _____ 3113 ❑ $500

**DOMESTIC VIOLENCE OFFENSES**

♦ Domestic Battery Fine, 730 ILCS 5/5-9-1.6 (domestic battery supervision/conviction) _____ 6005 ❑ $10

♦ Protection Order Violation Fine, 730 ILCS 5/5-9-1.11(a) _____ 6007 ❑ $20

**CONTROLLED SUBSTANCE/CANNABIS/HYPODERMIC NEEDLES OFFENSES**

♦ Spinal Cord Injury Paralysis Cure Research Trust Fund, 730 ILCS 5/5-9-1.1(c) (drug-related offense: cannabis, possession/delivery controlled substance) _____ 6015 ❑ ~~$5~~

**UNLAWFUL USE OF WEAPONS OFFENSES**

♦ Trauma Fund Fine, 730 ILCS 5/5-9-1.10 _____ 6003 ❑ $100

**ARSON OFFENSES**

♦ Arson Fine, 730 ILCS 5/5-9-1.12 (conviction of arson, residential arson, aggravated arson) _____ 2011 ❑ $500

## FEES AND COSTS NOT OFFSET BY THE $5 PER-DAY PRE-SENTENCE INCARCERATION CREDIT:

Other as ordered by the court: _____ 3010 _____

♦ Felony Complaint Filed, (Clerk) 705 ILCS 105/27.2a(w)(1)(A) _____ 1001 ~~$190~~

♦ Felony Complaint Conviction (State's Attorney), 55 ILCS 5/4-2002.1(a) _____ 7001 ~~$60~~

♦ Probable Cause Hearing (State's Attorney), 55 ILCS 5/4-2002.1(a) _____ 7004 ❑ $20

♦ Misdemeanor, Business or Petty Offense Complaint Filed (Clerk), 705 ILCS 105/27.2a(w)(1)(B)(C)(D) _____ 1002 ❑ $110

♦ Misdemeanor Complaint conviction (State's Attorney), 55 ILCS 5/4-2002.1(a) ($30, if associate judge $20) ___ 7002 ❑ $30 ❑ $20

♦ Minor Traffic or Ordinance Violation (Clerk), 705 ILCS 105/27.2a(w)(1)(E)(F)($30, if court appearance required $50) _ 1008 ❑ $30 ❑ $50

♦ Quasi-Criminal Complaint Conviction (Clerk), 705 ILCS 105/27.2a(w)(2)(B) _____ 1003 ❑ $50

♦ Quasi-Criminal Complaint Conviction (Local Prosecutor), 55 ILCS 5/4-2002.1(b) (IVC or similar ordinance) ___ 3003 ❑ $25

♦ State DNA ID System, Felony, 730 ILCS 5/5-4-3(j) (only if not convicted of a qualifying offense after July 1, 1990, or if not found guilty or given supervision for a qualifying offense under the Juvenile Court Act after January 1, 1997)_____ 6013 ❑ $250

♦ Automation (Clerk), 705 ILCS 105/27.3a-1 _____ 1006 ~~$25~~

♦ Public Defender Records Automation Fee, 55 ILCS 5/3-4012 _____ 8000 ~~$2~~

♦ State's Attorney Records Automation Fee, 55 ILCS 5/4-2002.1(a) _____ 7007 ~~$2~~

♦ Document Storage (Clerk), 705 ILCS 105/27.3c _____ 1007 ~~$25~~

♦ Electronic Citation Fee (Clerk & Arresting Agency), 705 ILCS 105/27.3e _____ 1017 ❑ $5

♦ Per Day of Trial (State's Attorney), 55 ILCS 5/4-2002.1(a)($50 per day) _____ 7003 _____

♦ Court Services (Sheriff), 55 ILCS 5/5-1103 _____ 5001 ~~$25~~

♦ Reimbursement for Court Appointed Counsel 725 ILCS 5/113-3.1 (may not exceed $500 misdemeanor, $5,000 felony)___ 2007 _____

Order Assessing Fines, Fees and Costs

Case No. 16CR15924

- ◆ Court System, 55 ILCS 5/5-1101(a) (for violation of 625 ILCS 5/1-100 et seq. other than DUI) _____ 2013 ☐ $5
- ◆ Court System, 55 ILCS 5/5-110(c) (guilty or supervision 730 ILCS 5/5-9-1) *(See fees below and insert on line)*
  $50 Felony, $25 Class A Misd., $15 Class B *or* C Misd., $10 Petty *or* Business Offense _____ 2018 _____
- ◆ Arrestee's Medical Costs Fund, 730 ILCS 125/17 _____ 2015 ☐ $10
- ◆ Probation and Court Services Operations Fee, 705 ILCS 105/27.3a-1.1 _____ 2023 ☐ $10
  Electronic Monitoring Fee 725 ILCS 5/110-10(a)(14.1), and (14.2) and (14.3) $30/day max. (assessed upon conviction or acquittal) 2020 _____
  Local Anti-Crime Program Reimbursement 730 ILCS 5/5-6-3.1(c)(12) (not to exceed max. amount of offense fine) 2006 _____
- ◆ Court Appointed Special Advocates Fund, 55 ILCS 5/5-1101 (f-10) _____ 2024 _____
- ◆ Concealed Carry Mental Health Reporting Fee, 430 ILCS 66/70 (e) _____ 6037 _____

## DUI OFFENSES

- ◆ Crime Lab DUI Analysis, State, 730 ILCS 5/5-9-1.9 (for each offense in each case where a laboratory analysis occurred _____ 6002 ☐ $150
- ◆ Crime Lab DUI Analysis, Northeastern (Buffalo Grove, Glencoe, Glenview, Hoffman Estates, Kenilworth, Lincolnwood,
  Northbrook, Northfield, Wheeling, Wilmette, and Winnetka) (for each offense in each case where a laboratory analysis occurred),
  730 ILCS 5/5-9-1.9 _____ 3005 ☐ $150
- ◆ Emergency Response Restitution, 625 ILCS 5/11-501.01(i) (not to exceed $1,000) _____ 3009 _____

## CONTROLLED SUBSTANCE/CANNABIS/HYPODERMIC NEEDLES OFFENSES

- ◆ Crime Lab Drug Analysis, State, 730 ILCS 5/5-9-1.4(b) ($100 per offense) _____ 6001 *100*
- ◆ Crime Lab Drug Analysis, Northern, 730 ILCS 5/5-9-1.4(b) ($100 per offense) _____ 3004 _____
- ◆ Controlled Substance Emergency Response Reimbursement, 720 ILCS 570/411.4(b), 1st Offense _____ 3020 ☐ $750
- ◆ Controlled Substance Emergency Response Reimbursement, 720 ILCS 570-411.4(b), Subseq. Offense $1,000 _____ 3021 ☐ $1,000
  Intravenous Transmitted Disease Testing, 730 ILCS 5/5-5-3(h) _____ 2008 _____

## SEX OFFENSES

- ◆ Sexually Transmitted Disease Testing Reimbursement, 730 ILCS 5/5-5-3(g) _____ 2009 _____
- ◆ Victim Counseling Services Reimbursement, 730 ILCS 5/5-5-6(g) _____ 3011 _____

## BOND FORFEITURE FEES

- ◆ Vacate or Amend Final Orders, 705 ILCS 105/27.2a(w)(1)(g) _____ 1012 ☐ $80
- ◆ Vacate Ex Parte Judgment, 705 ILCS 105/27.2a(w)(1)(I) _____ 1013 ☐ $45
- ◆ Vacate Bond Forfeiture Judgment, 705 ILCS 105/27.2a(w)(1)(J) _____ 1005 ☐ $30
- ◆ Vacate Bond Forfeiture Orders, 705 ILCS 105/27.2a(w)(1)(H) _____ 1004 ☐ $45
- ◆ Vacate SOS Failure to Appeal/Comply Notice, 705 ILCS 105/27.2a(w)(1)(K) _____ 1011 ☐ $50
- ◆ Vacate Bond Forfeiture, Recognizance, 55 ILCS 5/4-2002.1(a) _____ 7005 ☐ $20

All fines, fees, assessments, penalties and reimbursements must be paid in full not later than _____

JUDGE CAROL A. ___

FEB 22 2018

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
COOK CO.

**TOTAL:** $ *2,504*

**NUMBER OF DAYS SERVED IN CUSTODY:** *514 x 5*
(Allowable credit toward fine will be calculated) *0*
*Payable through the Clerk of the Circuit Court*

Defendant's Address _____ 1052 H. Massasoit Chicago IL 60651
 Street                    City                State           Zip Code

Defendant's Telephone Number ( _____ ) _____          Defendant's Signature *James J. Harris*

Dated _____ , _____          ENTERED:

Prepared by: _____          Date: _____

_____ *Ward 1928*
 Judge                                                      Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# IN THE CIRCUIT COURT OF COOK COUNTY

| PEOPLE OF THE STATE OF ILLINOIS | ) | CASE NUMBER 16CR1592401 |
|---|---|---|
| v. | ) | DATE OF BIRTH 09/13/87 |
| JAMES HARRIS | ) | DATE OF ARREST 09/26/16 |
| Defendant | | IR NUMBER 1395923   SID NUMBER 046469100 |

## ORDER OF COMMITMENT AND SENTENCE TO
## ILLINOIS DEPARTMENT OF CORRECTIONS
=======================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below is hereby sentenced to the Illinois Department of Corrections as follows:

| Count | Statutory Citation | Offense | Sentence | | Class |
|---|---|---|---|---|---|
| 001 | 720-570/402(A)(1)(A) | POSSESS 15<100 GRAMS HERO | YRS. 005 | MOS.00 | 1 |

and said sentence shall run concurrent with count(s) ___ ___ ___ ___

| | | | YRS. ____ | MOS. ____ | ___ |

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

| | | | YRS. ____ | MOS. ____ | ___ |

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

| | | | YRS. ____ | MOS. ____ | ___ |

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

| | | | YRS. ____ | MOS. ____ | ___ |

and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

On Count ____ defendant having been convicted of a class ___ offense is sentenced as a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ____ defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served in custody for a total credit of 0514 days as of the date of this order Defendant is ordered to serve 0002 years Mandatory Supervised Release.

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with the sentence imposed in case number(s) _____ _____ _____
AND: consecutive to the sentence imposed under case number(s) _____ _____ _____ _____

IT IS FURTHER ORDERED THAT MOTION STATE NOLLE PROS COUNTS 2,3 AND 4. _____

MITT TO ISSUE _____

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

DATED FEBRUARY 22, 2018
CERTIFIED BY C EDWARDS

ENTERED
JUDGE CAROL M. HOWARD-1928
ENTER: 02/22/18

DEPUTY CLERK
FEB 22 2018

VERIFIED BY
CM Howard 1928

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
JUDGE HOWARD CAROL M    1928

CCG N305