In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-2421

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

v.

**JAMES HARRIS,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 CR 667 — John J. Tharp, *Judge.*

## BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

THOMAS P. PEABODY
Assistant United States Attorney

BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................ 1

STATEMENT OF THE CASE .......................................................... 2

    Underlying Charges, Conviction, and Sentence ........................................ 2

    Supervised Release Violations ....................................................... 3

    Defendant's Motion to Calculate Supervised Release Term ........................ 7

    Supervised Release Revocation Hearings ..................................... 8

SUMMARY OF ARGUMENT ......................................................... 8

ARGUMENT ............................................................................ 11

I.    The District Court Had Jurisdiction to Revoke Defendant's
    Supervised Release. ........................................................... 11

    A.    Standard of Review...................................................... 11

    B.    Analysis .......................................................... 11

        1.    Defendant's Term of Supervised Release Was Tolled Until
        August 17, 2023. ............................................... 11

        2.    The District Court Retained Jurisdiction to Revoke
        Defendant's Supervised Release Even Without Tolling. ............. 18

        3.    Even if the District Court Lacked Authority to Impose a
        Sentence for Defendant's Salvation Army Conduct, a
        Remand Would Still Be Unnecessary. ......................... 21

II.    The District Court Committed No Procedural Error in Finding
    Defendant Committed Misconduct at the Salvation Army and
    Knowingly Possessed a Firearm. ..................................... 24

    A.    Standard of Review.................................................. 24

B. Background ..................................................................... 25

    1. June 28, 2023 Status Hearing...................................... 25

    2. July 12, 2023 Revocation Hearing .............................. 26

    3. District Court's Findings and Sentencing ................... 29

C. Analysis ........................................................................ 33

    1. The District Court Did Not Err in Accepting Defendant's Waiver. ..................................................... 34

    2. The District Court Did Not Misunderstand the Evidence in Finding that Defendant Knowingly Possessed a Firearm While on Supervised Release. ..................................... 40

CONCLUSION.................................................................... 42

# TABLE OF AUTHORITIES

## CASES

*Hill v. Werlinger*, 695 F.3d 644 (7th Cir. 2012).................................................. 22

*Mont v. United States*, 139 S. Ct. 1826 (2019) .......................................... 17, 18

*Morrissey v. Brewer*, 408 U.S. 471 (1972)......................................................... 34

*Ruiz v. United States*, 990 F.3d 1025 (7th Cir. 2021) ..................................... 22

*United States v. Ahmadzai*, 723 F.3d 1089 (9th Cir. 2013)............................ 12

*United States v. Armour*, 804 F.3d 859 (7th Cir. 2015) ............................ 25, 38

*United States v. Block*, 927 F.3d 978 (7th Cir. 2019).................... 11, 14, 15, 16

*United States v. Brennan*, 285 F. App'x 51 (4th Cir. 2008) ............................ 21

*United States v. Bussey*, 745 F.3d 631 (2d Cir. 2014) ..................................... 13

*United States v. Campbell*, 883 F.3d 1148 (9th Cir. 2018) .............................. 21

*United States v. Cole*, 567 F.3d 110 (3d Cir. 2009) ......................................... 16

*United States v. Edwards*, 834 F.3d 180 (2d Cir. 2016) .................................. 21

*United States v. Farrell*, 393 F.3d 498 (4th Cir. 2005) ................................... 37

*United States v. Fay*, 547 F.3d 1231 (10th Cir. 2008)..................................... 39

*United States v. Greco*, 938 F.3d 891 (7th Cir. 2019)................................ 11, 19

*United States v. Hernandez-Ferrer*, 599 F.3d 63 (1st Cir. 2010).................... 12

*United States v. Hodges*, 460 F.3d 646 (5th Cir. 2006).................................... 34

*United States v. House*, 501 F.3d 928 (8th Cir. 2007)...................................... 12

*United States v. Jackson*, 426 F.3d 301 (5th Cir. 2005) ............................ 13, 16

*United States v. Johnson*, 529 U.S. 53 (2000) .................................................. 16

*United States v. Karst*, 948 F.3d 856 (7th Cir. 2020)...................................... 24

*United States v. LeBlanc*, 175 F.3d 511 (7th Cir. 1999) .................................. 34

*United States v. Lee*, 795 F.3d 682 (7th Cir. 2015) .................................... 24, 25

*United States v. Maranda*, 761 F.3d 689 (7th Cir. 2014) .............................. 11

*United States v. Marvin*, 135 F.3d 1129 (7th Cir. 1998) ................................ 25

*United States v. Medrano*, 83 F.4th 1073 (7th Cir. 2023) ............................. 42

*United States v. Naranjo*, 259 F.3d 379 (5th Cir. 2001) ........................... 20, 21

*United States v. Njos*, 68 F.4th 1060 (7th Cir. 2023) ...................................... 23

*United States v. Pratt*, 52 F.3d 671 (7th Cir. 1995) ....................................... 34

*United States v. Presley*, 487 F.3d 1346 (11th Cir. 2007) .............................. 21

*United States v. Tapia-Escalera*, 356 F.3d  (1st Cir. 2004) ....................... 36, 37

*United States v. Taylor*, 747 F.3d 516 (8th Cir. 2014) ................................... 39

*United States v. Williams*, 85 F.4th 844 (7th Cir. 2023) ................................ 19

## STATUTES

18 U.S.C. § 922(g)(1) ...................................................................................... 2

18 U.S.C. § 3231 ............................................................................................. 1

18 U.S.C. § 3553(a) ................................................................................... 23, 29

18 U.S.C. § 3583 ..................................................................................*passim*

18 U.S.C. § 3585(b) ....................................................................................... 17

18 U.S.C. § 3624(e) ...............................................................................*passim*

18 U.S.C. § 3742(a) ......................................................................................... 1

21 U.S.C. § 841(a)(1) ...................................................................................... 2

28 U.S.C. § 1291 ............................................................................................. 1

730 ILCS 5/3-3-9 .......................................................................................... 14

## RULES

Federal Rule of Criminal Procedure 32.1(b)(2) ................................................. 34

Federal Rule of Criminal Procedure 11(b)(1) ................................................... 34

## SENTENCING GUIDELINE

U.S.S.G. § 7B1.4 .............................................................................................. 23

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct. This case arises from the revocation of defendant's supervised release after he was convicted of federal criminal offenses in the Northern District of Illinois. On July 14, 2023, the district court found that defendant violated his conditions of supervised release and sentenced defendant to 36 months' imprisonment. R. 594.[1] The district court entered final judgment on July 17, 2023. R. 598; App. 37. Defendant filed a timely notice of appeal on that same date, July 17, 2023. R. 595.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and 18 U.S.C. § 3583(e)(3). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED FOR REVIEW

1.    Whether the district court had jurisdiction to revoke defendant's supervised release more than three years after his three-year term of supervision began.

2.    Whether the district court procedurally erred in accepting defendant's waiver of his right to contest that he violated Salvation Army rules

---

[1] Citations to the Original Electronic Record on Appeal are designated as "R." followed by the document number. Defendant's brief and appendix are cited as "Br." and "App.," respectively, followed by the page number.

by using controlled substances, or in finding that defendant knowingly possessed a firearm while on supervised release.

## STATEMENT OF THE CASE

### *Underlying Charges, Conviction, and Sentence*

On September 5, 2012, defendant was charged by superseding information with two counts: one for conspiring to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), and one for possessing a firearm, namely a loaded Glock 9-millimeter pistol, after previously having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). R. 192. That same day, defendant pled guilty to both counts. R. 194. In doing so, defendant admitted that for periods in 2007 he worked for a narcotics distribution operation that sold large quantities of heroin. R. 195 ¶ 6a. He regularly received heroin from his co-conspirators, sold the narcotics to customers in Chicago, and then returned a share of the proceeds to his supervisors in the organization. *Id.* Additionally, defendant admitted that on November 25, 2009, after having been convicted of a felony, he carried a Glock 9-millimeter pistol, loaded with 15 rounds of ammunition, in the waistband of his pants while walking in Chicago. R. 195 ¶ 6b.

On January 24, 2013, the district court sentenced defendant to 66 months' imprisonment followed by a term of four years' supervised release. R. 258. Mandatory conditions of defendant's supervised release included

prohibitions on committing another state or federal crime and possessing controlled substances. *See, e.g.*, R. 415 at 5.

**Supervised Release Violations**

Defendant was released from prison and began his term of supervised release on July 25, 2016. *See* R. 483 at 3. Two months later, on September 26, 2016, defendant was arrested and charged in the Circuit Court of Cook County, Illinois with distribution of a controlled substance, namely 693.8 grams of heroin (the "Illinois Heroin Case"). R. 409 at 3. The Probation Office issued a special report to alert the district court of this alleged violation of his supervised release, *id.*, and the parties agreed to continue any revocation proceedings until after defendant's state case was resolved. *See* R. 416 ¶ 6; R. 419 ¶¶3-5. On February 22, 2018, defendant pled guilty in the state to heroin possession and was sentenced to five year's imprisonment and two year's mandatory supervised release. *See* App. 43-45, 51. On May 21, 2018, in light of that conviction, the district court revoked defendant's release and sentenced him to one year's imprisonment, to run consecutive to his state sentence, followed by a three-year term of supervised release. R. 468.

Defendant began his new, three-year term of supervised release on March 17, 2020, and so Probation calculated that his term would expire on March 16, 2023. *See* R. 473 at 4. Less than four months later, on July 21, 2020, defendant again was arrested and charged in Cook County, Illinois—this time

with state gun offenses, including the crime of being a convicted felon in unlawful possession of a firearm (the "Illinois Gun Case"). *Id.* at 5. On July 23, 2020, Probation filed a special report with the district court, alleging that defendant had violated the terms of his supervised release by committing a state firearms offense ("Violation #1"). *Id.* at 4. Five days later, on July 28, 2020, the district court issued a bench warrant for defendant's arrest. R. 474, 475.

On August 13, 2020, defendant's supervised release in the Illinois Heroin Case was revoked, and he was imprisoned in the Illinois Department of Corrections ("IDOC") for five months—a term he completed on January 14, 2021. R. 483 at 4; R. 485 at 1; R. 607-1. Following that period of incarceration, defendant moved the district court to permit him to remain on home detention until his state case resolved. R. 496. The district court granted his motion, imposing a curfew on defendant and requiring him to wear an electronic-monitoring bracelet. *See* R. 522; R. 523; R. 554 at 5

On August 31, 2022, Probation filed a special report, delineating nine separate violations of defendant's court-imposed curfew. R. 551 at 5. On September 13, 2022, Probation filed another special report, advising the district court of additional violations and informing it that defendant had become homeless. *See* R. 554 at 5-6. In response, the district court ordered defendant detained and, at defendant's request, on September 21, 2022,

required that he reside at a Salvation Army Residential Reentry Center (the "Salvation Army") rather than the Metropolitan Correctional Center ("MCC"). R. 555, 557, 559. To effectuate that result, the court added a condition of defendant's release requiring him to "reside at or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons Salvation Army) for all or part of the term of supervised release, for a period up to 120 days." R. 555.

The next month, on October 31, 2022, Probation filed a special report to alert the district court that, since arriving at the Salvation Army, defendant had twice tested positive for using controlled substances: first for THC marijuana, based on a drug test he took on September 22, 2022, and then for THC marijuana, Methylenedioxyamphetamine (MDA), and Methylenedioxymethamphetamine (MDMA), based on a separate drug test he took on September 28, 2022. R. 560 at 5. The report further described that, during an October 18, 2021 interview with his probation officer, defendant admitted that he had both smoked marijuana and used a "vape pin" that he obtained from another Salvation Army resident. *Id.* at 6.

In light of defendant's reported conduct, he was unsuccessfully discharged from the Salvation Army on November 10, 2022. R. 568 at 6. And on November 16, 2022, the district court ordered that defendant be detained at the MCC. R. 564. Probation then filed another special report, which accused

defendant of violating his recently-added condition of release that he "participate in the program of a community corrections facility (including . . . the Bureau of Prisons Salvation Army)" ("Violation #8"). R. 568 at 5-6. Specifically, Probation's report alleged that defendant (1) possessed "narcotic/drug paraphernalia," (2) failed "to meet with [his] case manager," (3) was found "in an unauthorized area without staff authorization," and (4) possessed an "unauthorized" item or one "not issued through regular channels." *Id.* at 6.

Because his Illinois Gun Case remained pending, defendant sought to resolve that case before defending the alleged violations of his federal supervised release. *See* R. 569 at 2. The Illinois Gun Case was scheduled to begin on April 7, 2023, and so the district court scheduled an in-person hearing to occur on April 14, 2023. R. 575. At the April 14, 2023 hearing, defendant reported that his trial had been continued to June 20, 2023, prompting the district court to continue the supervised release hearing until after that date. R. 579, 583.

On June 21, 2023, defendant was acquitted following trial in the Illinois Gun Case. *See* R. 584. The district court then held a hearing on June 26, 2023, at which time the court issued a summons and set defendant's revocation hearing for June 28, 2023. R. 586, 588. The summons identified eight alleged violations of defendant's supervised release, including Violation #1 (that he

had committed another federal, state, or local crime by possessing a firearm) and Violation #8 (that he failed to participate in a community corrections program by violating Salvation Army regulations, including by using controlled substances at the facility). *See* R. 589; *see also* R. 568 at 6.

### Defendant's Motion to Calculate Supervised Release Term

Prior to the revocation hearing, on June 26, 2023, defendant submitted a filing he styled as a "Motion For the Court to Calculate When Defendant's Supervised Release Should Terminate." R. 587. In it, defendant stated that he was unsure the "exact date" in 2020 when his three-year term of supervision began, but posited that his term "either has expired or [was] about to expire." *Id.* at 2. Defendant asked the court to determine whether his supervised release term had lapsed and, if so, terminate the proceedings. *Id.*

The government filed a response setting forth the district court's continuing jurisdiction. R. 590. The government explained that the term, which began in March 2020, was tolled for approximately five months—from August 2020 through January 14, 2021—when his supervised release in the Illinois Heroin Case was revoked. *Id.* at 2-3 (citing 18 U.S.C. § 3624(e)). And even if the term had expired, the government contended, the district court retained authority to sanction defendant's violations because it had issued a warrant on July 28, 2020, right after Probation advised it of the Illinois Gun Case. R. 590 at 3-4 (citing 18 U.S.C. § 3583(i)). The government further

emphasized that defendant himself had agreed—in fact, requested—to delay adjudication of the alleged firearm-related violation of his supervised release until after his Illinois Gun Case was finished. *Id.* at 4.

The district court agreed with the government and found that it retained jurisdiction to revoke defendant's supervision. *See* R. 594.

***Supervised Release Revocation Hearings***

As detailed more fully in Section II.B. below, the district court held a revocation hearing on July 12, 2023. *See* R. 604. At the outset of the hearing, defense counsel indicated that defendant would admit to using controlled substances in violation of Salvation Army rules, but wished to contest the allegation that he knowingly possessed a firearm on July 21, 2020. *Id.* at 3-4. Following the evidentiary hearing, on July 14, 2023, the district court announced its finding of guilt regarding the charge of unlawful firearm possession (Violation #1) and imposed a 36-month sentence of imprisonment. *See* App. 29-31. The court imposed a concurrent term of 24 months' imprisonment for failing to participate in the Salvation Army community corrections program (Violation #8). *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

Defendant's term of supervised release had not expired when the district court revoked it on July 14, 2023. Although his three-year term began on

March 17, 2020, federal supervised release is tolled, pursuant to 18 U.S.C. § 3624(e), during any period of imprisonment of 30 days or more that results from another state or federal conviction. Here, defendant had spent five months imprisoned in IDOC because a separate term of supervised release, imposed as part of a state conviction for possessing heroin, was revoked. Those five months of state custody automatically adjusted the expiration of his federal supervision from March 16, 2023 to August 17, 2023.

Even if there had been no tolling, pursuant to 18 U.S.C. § 3583(i), the district court may sanction supervised release violations committed during the term, even after the term has expired, where, as here, it issued a warrant or summons before the term's expiration. Contrary to defendant's argument, § 3583(i) does not operate on a violation-by-violation basis, but preserves, as this Court has said, the district court's subject matter jurisdiction over supervised release. Regardless, defendant's appeal contests only his 24-month sentence for violating the regulations of the Salvation Army. But the district court also imposed a longer, concurrent sentence—36 months for possessing a firearm— that defendant does not challenge. A remand is thus unnecessary, even if the Court were to find jurisdiction to impose the 24-month sentence lacking.

The district court committed no procedural error in accepting defendant's waiver of the right to contest the allegation that he failed to comply with the Salvation Army's rules or in finding that defendant knowingly

possessed a firearm—claims defendant never raised in the district court. Defense counsel advised the district court that defendant wished to admit guilt to committing infractions at the Salvation Army, including using controlled substances there, and to contest the firearm charge. Later in the proceedings, both government counsel and the judge noted that the Salvation Army-related allegation had been admitted by the defendant. Defendant did not object or disagree at any of those three junctures. Moreover, before the court imposed its 24-month sanction, defendant expressly told the court that he had "accepted responsibility for using drugs," as alleged. Accordingly, defendant waived the issue. And, even if not waived, the district court did not err, plainly or otherwise, in accepting defendant's choice not to contest that he used controlled substances at the Salvation Army, particularly where his guilt was supported by positive drug tests and a confession to his probation officer.

Regarding the firearm, contrary to defendant's claim on appeal, the district court did not confuse the post-arrest claims made by defendant with the argument that his state trial counsel made to a jury. The district court offered a thorough explanation for its finding of guilt by a preponderance of the evidence, which included an accurate accounting of the countervailing claims made by defendant and his prior counsel. And even if the district court had misstated the record (which it did not), that error would be harmless, as the source of counsel's claim did not influence the court's finding of guilt.

# ARGUMENT

## I. The District Court Had Jurisdiction to Revoke Defendant's Supervised Release.

### A. Standard of Review

This Court reviews *de novo* whether the district court had jurisdiction to revoke defendant's supervised release. *United States v. Block*, 927 F.3d 978, 981 (7th Cir. 2019); *United States v. Greco*, 938 F.3d 891, 894 (7th Cir. 2019).

### B. Analysis

#### 1. Defendant's Term of Supervised Release Was Tolled Until August 17, 2023.

A district court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). While a defendant's supervised release ordinarily ends at the conclusion of the term originally imposed by the district court, that term is tolled "during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period less than 30 consecutive days." 18 U.S.C. § 3624(e). Such imprisonment "pause[s] and postpone[s] an ongoing term" of supervision. *United States v. Maranda*, 761 F.3d 689, 695 (7th Cir. 2014).

Here, defendant's term of supervised release had not expired on July 14, 2023, when the district court revoked defendant's supervision and sentenced him to 36 months' imprisonment. Although defendant's three-year term of supervised release began on March 17, 2020 and, thus, would otherwise have expired on March 16, 2023, *see, e.g.*, R. 473 at 3, defendant was imprisoned in the Illinois Department of Corrections for five months of that period—from August 13, 2020 through January 14, 2021—when his supervised release was revoked in his Illinois Heroin Case. *See* R. 485 at 1; R. 607-1. As a consequence, that incarceration tolled his federal supervised release by five months (154 days to be precise). The new expiration date became August 17, 2023, more than a month after the July 14, 2023 revocation hearing.

Given § 3624(e)'s plain language, numerous federal courts of appeals have held that its tolling provision is triggered when a defendant who is on federal supervised release is imprisoned in a state case. *See, e.g.*, *United States v. Ahmadzai*, 723 F.3d 1089, 1093 (9th Cir. 2013) ("whenever a person is imprisoned for one crime, a term of supervised release for another crime does not run, regardless of any other circumstances") (citation omitted); *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67 (1st Cir. 2010) ("The government is correct that imprisonment lasting for at least thirty days, in connection with a different offense, tolls the running of a supervised release term."); *United States v. House*, 501 F.3d 928, 930 (8th Cir. 2007) ("under the express terms of

18 U.S.C. § 3624(e), the one-year term of supervised release was tolled . . . when House began serving an eight-year prison sentence imposed by the State of Missouri"). That remains true when the state detention results from revocation of a term of state supervision. *See United States v. Bussey*, 745 F.3d 631, 633 (2d Cir. 2014) (finding that defendant's federal supervised release was tolled for the entirety of his 22-month incarceration for violating parole in a New York state case because "the incarceration that results from revocation is a consequence of the underlying crime of conviction"); *United States v. Jackson*, 426 F.3d 301, 303-04 (5th Cir. 2005) (holding that defendant's "[federal] supervised release period was tolled while he was incarcerated for [a state] parole violation," even though the parole violation was later held unconstitutional, because § 3624(e) "indicates that the period of supervised release does not run during imprisonment; the statute states no exceptions").

Defendant suggests that because the five months he spent imprisoned in the Illinois Heroin Case was triggered by the revocation of supervised release, it should not count for purposes of § 3624(e)'s tolling provision. Br. 17. In a similar vein, he contends that only custody resulting from a "new 'conviction'" should cause federal supervised release to toll. *Id*. But the tolling provision of 18 U.S.C. § 3624(e) is not limited to *new* convictions or to terms of imprisonment imposed in the immediate wake of sentencing. Rather, by its plain, broad language, a term of federal supervised release "does not run

during any period in which the person is imprisoned *in connection with a conviction* for a . . . State . . . crime." Here, defendant's five-month imprisonment was in connection with his Illinois state conviction for possessing heroin. Indeed, defendant's state supervised release was imposed at sentencing for that conviction, (*see* App. 51), and he served the five months of imprisonment at issue as part of that sentence (*see* R. 607-1 at 2-3).[2]

Defendant cites to *Block*, 927 F.3d 978, in support of his position. But *Block* involved a fundamentally different circumstance, and its holding, if anything, undermines his position. Br. 15-16. In *Block*, Probation accused the defendant of violating conditions of his three-year term of *federal* supervised

---

[2] Illinois enacted legislation in 1977 that did away with parole, which limited the ability of "the parole board to make discretionary decisions regarding inmate release, and replaced it with a system designed to allow almost no discretion to anyone besides the trial judge and/or jury on the length of time individuals spent in prison and once released under mandatory supervised release." Karl Gruschow, *Parole and Mandatory Supervised Release in Illinois*, Illinois Criminal Justice Information Authority, available at https://icjia.illinois.gov/researchhub/articles/parole-and-mandatory-supervised-release-in-illinois (last visited March 20, 2024).

Pursuant to Illinois law, the Illinois Prisoner Review Board determines whether to "revoke the parole or mandatory supervised release" of a defendant upon a violation of his terms of supervision. 730 ILCS 5/3-3-9(a)(3). Under current law, parolees may be revoked and reincarcerated "for any portion of the imposed maximum term of imprisonment or confinement which had not been served at the time of parole and the parole term, less the time elapsed between the parole of the person and the commission of the violation for which parole was revoked." 730 ILCS 5/3-3-9(a)(3)(i)(A). For supervised releasees, "the recommitment shall be for the total mandatory supervised release term, less the time elapsed between the release of the person and the commission of the violation for which mandatory supervised release is revoked." 730 ILCS 5/3-3-9(a)(3)(i)(B).

release, and the district court detained defendant pending a hearing on those allegations without issuing any summons or warrant. *Id.* at 981. More than a year later, after defendant's term of supervision had expired, the district court held the hearing and formally revoked defendant's supervised release. *Id.*

On appeal, this Court held that the district court lacked jurisdiction over the matter, because Block's period of incarceration pending the revocation hearing did not toll his term of supervision, as 18 U.S.C. § 3583(e)(3) grants district courts the power to "require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release." 927 F.3d at 982. In other words, this Court reasoned that defendant's pre-hearing detention amounted to an in-custody portion of the three-year term of supervision he was serving—a term that continued to run while he was detained in the same federal case. As the Court put it, "§ 3624(e)'s tolling provision is inapposite where a releasee is reincarcerated as a result of his *original conviction*." *Id.* (emphasis added).

This case presents the opposite situation. Unlike in *Block*, defendant's five months in custody was served in a different case, in a different jurisdiction. To the extent *Block* has any application here, it underscores that defendant's time in custody following the revocation of his state supervised release occurred "as a result" of that state conviction and, naturally therefore, was in connection with it—precisely as § 3624(e) contemplates. *See* 927 F.3d at 982.

Indeed, in reaching its holding that a federal supervisee's detention in the same case does not toll his term of supervision, the *Block* Court cited the Third Circuit's pronouncement in *United States v. Cole*, 567 F.3d 110, 114-15 (3d Cir. 2009), that "Congress has provided for [tolling] in only one situation: where the defendant is imprisoned for more than 30 days for *another* conviction." 927 F.3d at 982 (cleaned up). That is plainly the case here.

The rule for which defendant advocates would frustrate the purpose of supervised release in the federal system. As the Fifth Circuit emphasized in ruling that a revoked term of state parole tolls a defendant's federal supervision: "'The objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release.' Supervised release serves a rehabilitative role 'distinct from those served by incarceration' by helping defendants transition back into the community." *Jackson*, 426 F.3d at 305 (quoting *United States v. Johnson*, 529 U.S. 53, 59 (2000)). As in *Jackson*, while defendant "was in prison [for violating the terms of his state release], purposefully kept *out* of the community, his [federal] probation officer could not supervise him; it was impossible for his probation officer to assist him in *returning* to the community." 426 F.3d at 305 (emphasis in original). The same rationale supports the district court's common-sense reading of § 3624(e)'s tolling provision in the instant case. *See* R. 594 (agreeing with the government that defendant's supervision was tolled).

16

Defendant's citation to *Mont v. United States*, 139 S. Ct. 1826 (2019), does not help his position either. Br. 15. *Mont* confronted the separate question whether a defendant's pretrial detention prior to a conviction satisfies § 3624(e)'s requirement that the imprisonment be "in connection with a conviction" and thus tolls a term of federal supervised release. 139 S. Ct. at 1832. For a variety of reasons that weigh in favor of tolling here, the Supreme Court answered that question in the affirmative. *Id.* First, the Court observed that "the term 'imprison' has meant 'to put in a prison,' 'to incarcerate,' 'to confine a person, or restrain his liberty, in any way,'" *id.* (cleaned up), and that it "has often recognized that 'in connection with' can bear a 'broad interpretation.'" *Id.* Next, the Court deemed the text of the statute to be retrospective-looking—that is, to compel courts to calculate the time spent "in connection" with a conviction "upon the defendant's release from custody." *Id.* at 1833. Finally, the Court found "it would be an exceedingly odd construction of the statute to give a defendant the windfall of satisfying a new sentence of imprisonment and an old sentence of supervised release with the same period of pretrial detention," since "[s]upervised release is a form of punishment prescribed along with a term of imprisonment as part of the same sentence" and "Congress denies defendants credit for time served if the detention time has already 'been credited against another sentence.'" *Id.* at 1834 (quoting 18 U.S.C. § 3585(b)). As the Court stressed, "Mont's reading of § 3624(e) would

deprive the Government of its lawfully imposed sentence of supervised release while the defendant is serving a separate sentence of incarceration—one often imposed by a different sovereign." *Id.*

Each of the *Mont* Court's reasons underscore what a plain reading of the tolling statute indicates for present purposes: that when a federal supervisee spends time imprisoned following a state conviction, his term of federal supervised release is tolled for that period. *See* 139 S. Ct. at 1833 ("The objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release because supervised release has no statutory function until confinement ends.") (cleaned up).

## 2. The District Court Retained Jurisdiction to Revoke Defendant's Supervised Release Even Without Tolling.

Even if defendant had never been imprisoned by the State of Illinois—and there had been no tolling at all—the district court still would have retained jurisdiction to revoke defendant's supervised release when it did so on July 14, 2023. That is because the "power of the court to revoke a term of supervised release" can extend beyond the term itself "for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation." 18 U.S.C. § 3583(i). As this Court has said, "§ 3583(i)'s warrant requirement goes to the district court's subject-matter jurisdiction."

*See Greco*, 938 F.3d at 895 (cleaned up). Here, the district court issued a warrant for defendant's arrest on July 28, 2020, and therefore retained jurisdiction to revoke defendant's supervision—and impose the 36-month sentence that it did—after his term of federal supervision expired.

Defendant does not dispute the district court's jurisdiction to revoke his supervision for unlawfully possessing a firearm.[3] *See* Br. 18 ("The court did retain jurisdiction to consider the gun charge, because it issued a warrant related to *that* violation on July 28, 2020"). Rather, defendant protests the district court's authority to *also* impose a concurrent, 24-month term of imprisonment for breaking Salvation Army rules, since the summons related to that infraction was not issued by the district court until June 26, 2023—a date defendant contends was after his term of supervision expired. *See* Br. 18. As explained above, after accounting for five months' tolling, defendant's supervised release was extended until August 17, 2023. But even without tolling, the warrant issued by the district court on July 28, 2020, continued its jurisdiction to sanction defendant for all supervised release violations he

---

[3] Defendant has never argued that the delay in adjudicating his supervised release violation was not "reasonably necessary" as contemplated by § 3583(i). To the contrary, defendant sought to delay such adjudication until after his Illinois Gun Case resolved. *See* R. 569 at 2. Accordingly, that argument, were he to make it, would be waived. *United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023)

committed during his term of supervision, including his drug use at the Salvation Army in September 2022.

Section 3583(i) is broadly worded to extend the district court's jurisdiction "for violation of a condition of supervised release . . . beyond the expiration of the term . . . if, before its expiration, a warrant or summons has been issued on the basis of an allegation of *such a violation*" (emphasis added). While the Seventh Circuit has not yet had occasion to address its scope, the Fifth Circuit has held that "[t]he statute does *not* require the pre-term-expiration warrant to be based on an allegation concerning the *specific* violation for which revocation may be later, or ultimately, sought . . . because it uses the phrase 'such *a* violation,' *not* 'such violation.'" *United States v. Naranjo*, 259 F.3d 379, 382 (5th Cir. 2001) (emphasis in original). Put differently, "the statute's plain language permits revocation based on *any* violation of a condition of supervised release occurring during the supervision term, even if *not* contained in a petition for revocation filed during that term, *so long as* a warrant or summons was issued during that term on the basis of

*an alleged violation.*" *Id.* at 383 (emphases in original).[4] Given the plain language, the warrant issued by the district court empowered it to sanction defendant's drug use at the Salvation Army, in addition to his unlawful possession of a firearm.

### 3. Even if the District Court Lacked Authority to Impose a Sentence for Defendant's Salvation Army Conduct, a Remand Would Still Be Unnecessary.

Whether or not the district court had authority to sentence defendant to 24 months for misconduct at the Salvation Army, a remand is unnecessary, because defendant agrees the court retained jurisdiction to impose its concurrent sentence of 36 months for unlawfully possessing a firearm. *See* Br. 18. Defendant therefore suffered no prejudice from the sentence he challenges.

---

[4] Other Circuits are in accord. *See United States v. Presley*, 487 F.3d 1346, 1349 (11th Cir. 2007) ("[I]ts authority to determine if his supervised release should be revoked was not confined to the specifications of the summons. Instead, once Presley was before the court it had the power to consider any violation of the terms of the release and base a revocation on it."); *United States v. Brennan*, 285 F. App'x 51, 57 n.2 (4th Cir. 2008) (agreeing with Fifth and Eleventh Circuit's reading of § 3583(i)'s "plain language"). *See also United States v. Edwards*, 834 F.3d 180, 193-94 (2d Cir. 2016) ("[W]e need not here delineate the full range of violations that can be charged post-supervision provided a timely warrant or summons is issued. We conclude only that the plain language of § 3583(i) empowers a district court to revoke supervised release based on such additional violations where, as here, those violations involve conduct related to the violation charged in the timely warrant . . . ."). *But see United States v. Campbell*, 883 F.3d 1148, 1153 (9th Cir. 2018) (resolving "an issue the Second Circuit [in *Edwards*] eschewed" by finding that Congress intended "to limit the universe of violations alleged post-expiration which a court is empowered to adjudicate under 18 U.S.C. § 3583(i) to only those which are factually related to matters raised in a signed warrant or summons issued before expiration").

"In a similar vein to harmless error review," the concurrent sentence doctrine "allows courts to pretermit decision about convictions producing concurrent sentences when the extra convictions do not have cumulative effects." *Ruiz v. United States*, 990 F.3d 1025, 1033 (7th Cir. 2021) (citation omitted). "Put another way, the doctrine allows appellate courts to decline to review a conviction carrying a concurrent sentence when one concurrent conviction has been found valid." *Id.* (cleaned up). "Where no prejudice results from foregoing review of the challenged conviction, a court may properly exercise its discretion in declining to reach the merits of the conviction." *Id.*; *see also Hill v. Werlinger*, 695 F.3d 644, 649 n.1 (7th Cir. 2012) (the doctrine requires (1) an equal or longer sentence on an unchallenged conviction, and (2) no adverse collateral consequences by declining to review the challenged conviction). The Court should elect do so here, where defendant suffers no harm from the 24-month sentence he disputes.

Defendant contends that, if the court lacked jurisdiction over his Salvation Army violations, the error in imposing a sentence for that conduct was not harmless because the district court viewed the firearms violation as "not that serious," Br. 19, and, in fact, considered his behavior at the Salvation Army to be "as serious as the gun possession," Br. 20. The record does support that claim. Read in proper context, the district court compared defendant's firearm possession to other, hypothetical gun offenses—not to defendant's use

of narcotics. *See* App. 8-9 ("[O]n the spectrum of the seriousness of crimes committed by people possessing firearms as felons . . . you . . . might well suggest that Mr. Harris only had the gun temporarily. But even temporary possession . . . is a violation of the law. It is not, however, the most serious species of a violation. . . .").

Defendant's position is further rebutted by the reality that the district court sentenced him to an above-Guidelines sentence of 36 months on the firearms violation alone, and to a lesser, within-Guidelines term of 24 months for his Salvation Army behavior. App. 29-31. And to the extent that such behavior factored into the court's sentencing determination on the firearms offense, that would be entirely appropriate, as district courts are specifically tasked to consider the factors set forth in 18 U.S.C. § 3553(a)—such as defendant's history and characteristics—in determining a reasonable sentence for a supervised release violation. *See United States v. Njos*, 68 F.4th 1060, 1065 (7th Cir. 2023) ("To determine a reasonable sentence, a district court should start with U.S.S.G. § 7B1.4 and consider the § 3553(a) factors."). Indeed, in sentencing defendant, the district court initially sought to impose just one sentence of 36 months' imprisonment. *See* App. 31 ("I don't have to impose it on each individual count. So the sentence will be 36 months of imprisonment."). It was not until the probation officer advised the court that two separate sentences would be required that it elected to impose a 24-month concurrent

sentence for violating the Salvation Army condition. *See* App. 32. On these facts, a remand would serve no purpose.

*   *   *   *   *   *

In sum, 18 U.S.C. § 3624(e)'s tolling provision dictates that defendant's term of supervised release had not expired on July 14, 2023, when the district court sentenced defendant to concurrent prison terms of 36 months for unlawfully possessing a firearm and 24 months for transgressions at the Salvation Army. Even without tolling, the district court retained jurisdiction to revoke defendant's supervised release, pursuant to 18 U.S.C. § 3583(i), because it issued a warrant prior to the expiration of the original term. Regardless, any error in imposing the 24-month sentence that defendant challenges was harmless, as he concedes the concurrent sentence of 36 months was properly imposed.

## II. The District Court Committed No Procedural Error in Finding Defendant Committed Misconduct at the Salvation Army and Knowingly Possessed a Firearm.

### A.    Standard of Review

If properly preserved, procedural and other constitutional challenges to supervised release revocation proceedings are reviewed *de novo*. *United States v. Karst*, 948 F.3d 856, 864 (7th Cir. 2020); *United States v. Lee*, 795 F.3d 682, 685 (7th Cir. 2015). However, if a defendant neglected to raise with the district court the procedural or constitutional complaint he lodges on appeal, his

24

challenge is reviewed for plain error. *Lee*, 795 F.3d at 685; *United States v. Marvin*, 135 F.3d 1129, 1135 (7th Cir. 1998). On plain error review, this Court will reverse the result of a supervised release revocation proceeding "to correct only particularly egregious errors for the purpose of preventing a miscarriage of justice." *Marvin*, 135 F.3d at 1135 (cleaned up). Where defendant's failure to object was intentional, the challenge is waived. *United States v. Armour*, 804 F.3d 859, 866 (7th Cir. 2015).

## B. Background

### 1. June 28, 2023 Status Hearing

On June 28, 2023, the district court held a hearing, during which defendant's counsel sought to withdraw from the case, citing "a very contentious relationship" with defendant. R. 591; R. 606 at 2. Initially, defendant supported the motion and expressed a desire to proceed with a revocation hearing *pro se*. R. 606 at 3. The court, however, advised defendant why, in its view, that was a "bad idea," prompting defendant to change course and "go with [his] attorney." *Id.* at 5-6. In the course of its colloquy with defendant, the district court explained that the government was seeking to have his supervision revoked based on his "possession of a firearm," "failure to comport with the Salvation Army requirements," and "positive drug tests that were conducted during that period of time." *Id.* at 11.

In explaining the role of an attorney in a revocation proceeding, the

district court stressed that "[i]t's not [your attorney's] decision to say plead guilty to these violations or don't plead guilty. That's your decision." R. 606 at at 14. The court advised defendant to "talk to [your attorney] about that." *Id.* Because defense counsel sought additional time to prepare for a revocation hearing, the court continued the hearing to July 12, 2023. *Id.* at 8, 12-13. The court also denied defense counsel's motion to withdraw from the case. *Id.* at 13.

## 2. July 12, 2023 Revocation Hearing

On July 12, 2023, the district court held an evidentiary hearing. R. 592. At the outset, defense counsel outlined that there were three separate incidents he understood the government sought to prove: (1) defendant's possession of a firearm in July 2020, (2) defendant's misconduct at the Salvation Army in fall 2022, and (3) though not formally charged as a violation of his supervised release, defendant's participation in a June 2023 fight at the MCC. R. 604 at 3-4. Counsel indicated that defendant would contest the allegations concerning the firearm and MCC fight. *Id.* at 3-4. And as to the firearm-related allegation specifically, counsel stated that defendant has "said all along that he's not guilty of that. That's his position." *Id.* at 3. As to the Salvation Army-related allegations, however, defense counsel advised the court:

> Mr. Harris is in a position to admit to those violations which was basically coming up positive for marijuana and then also there was some MDMA, some marijuana that he had smoked and he came

up positive for that as well. And he was in a restricted or an unauthorized area that he went into at the Salvation Army. And he would be in a position to admit to those.

R. 604 at 3.

The government began its presentation of the evidence by describing a five-page report issued by the Salvation Army that chronicled numerous allegations of misconduct at the facility. *See* R. 604 at 7. Government counsel explained, "[e]ven though Mr. Harris is admitting to the violation, which is unlawful use of a controlled substance, I do want to provide a little more detail and context of what occurred at the Salvation Army." *Id.* The government then began summarizing the report's contents, including its notation that, on November 9, 2022, a security officer observed "a handmade pulley with a bag attached that was being lowered out of one of the resident windows." *Id.* at 9. The government further described that "Mr. Harris had gone into a room in which he was not supposed to be and then gotten out and locked the door, and then one of the investigators found and confiscated a handmade pulley made from bed linens attached to a plastic bag and then inside was illicit substances." *Id.* at 9-10.

Defense counsel interrupted:

Mr. Harris just wants me to basically relate that he was in the Salvation Army in part because he was splitting the rent with his cousin who did not pay the rent, and he was tossed out of the apartment that they were renting. … So that is the major reason [the court] put him in the Salvation Army. But we do not disagree

27

with the report or the things that were alleged regarding the violations at the Salvation Army.

R. 604 at 10. Defendant interjected: "That's a lie." R. 604 at 10. Government counsel then proceeded with his description of the contents of the Salvation Army report, concluding that "Mr. Harris [was] discharged as a program failure due to a cumulative amount of incident reports." *Id.* at 10-11.

The government next presented its proof that defendant possessed a firearm on July 21, 2020. R. 604 at 11. Such evidence included a 911 call that described a person matching defendant's description carrying a bag with a firearm inside it; a surveillance video that showed defendant carrying such a bag; body-worn camera video from the responding police officers who retrieved the bag after defendant set it down and fled; and transcripts of testimony from defendant's state trial, including from the officer who retrieved the firearm from inside the bag. *Id.* at 11-18.

Defense counsel conceded that defendant possessed the bag at issue, but argued that the government had failed to prove defendant *knew* a firearm was inside it. R. 604 at 21-24, 32. Defendant submitted a transcript of the state trial testimony of his friend (LaDonna Crawford), who had claimed ownership of both the purse and the firearm. *Id.* at 24-26. In her testimony, Crawford stated that on the date of defendant's arrest, she had accidentally left her purse—which contained her firearm—at a friend's house and that the friend

28

had asked defendant to return Crawford's purse to her. *Id.* at 24-25. Defendant argued that Crawford's testimony undercut the government's position that defendant knew the purse contained a firearm, and emphasized that a state jury had acquitted him of knowingly possessing it. *Id.* at 26.

Lastly, with an eye towards the factors set forth in 18 U.S.C. § 3553(a), the government presented evidence to prove that on June 4, 2023, defendant attacked another inmate at the MCC and that the victim was stabbed by an unknown assailant during the resulting melee. R. 604 at 33-40. The evidence included video of the incident, reports of witness interviews, and recorded jail calls made by defendant. *Id.*

### 3.    District Court's Findings and Sentencing

The district court announced its findings at a hearing on July 14, 2023. App. 1. The district court found by a preponderance of the evidence that defendant knowingly possessed a firearm on July 21, 2020. App. 3. First, the court found persuasive that the 911 caller—whose call the jury in defendant's state trial did not hear—knew a firearm was in the purse defendant carried, rendering it "inconceivable" that defendant did not know the purse's contents.[5] App. 3. The court also found that the surveillance video established defendant's knowledge of the purse's contents, as it showed defendant setting down the bag

---

[5] The district court surmised that the hearsay rule precluded the 911 call from being played for the jury in defendant's state trial. App. 3.

and abandoning it upon seeing the responding police officers. App. 4. And the court highlighted that before doing so, defendant wore the bag in a "crossbody fashion," seemingly to secure the firearm and two magazines inside it. App. 6. The court noted, moreover, that defendant admitted to the arresting officers that he knew the bag contained insulin and, therefore, must have looked inside. App. 5.

The district court found not credible the explanations defendant had given to the arresting officers, finding them illogical and shifting. App. 5. For instance, defendant first told the officers that he ran because he was selling drugs; yet he had no drugs at the time of his arrest, and there were none in the bag he set down before fleeing. App. 5. Though defendant claimed that he had thrown his "weed" before the officers detained him, that claim was belied by the surveillance video. App. 5. And his claim that he ran because he had an ecstasy pill in the pocket was likewise undermined by its absence. App. 6. The court also found "curious" defendant's attempt to make a deal with the officers—offering to "get the police more guns if they [would] let him out the back door" of the police car. App. 6.

The district court also considered and rejected the argument made by defense counsel at his state trial that defendant ran because of an outstanding arrest warrant. App. 5. As the court put it, there was no reason for defendant to suspect the police "would suddenly have shown up at that spot to execute an

arrest warrant for Harris"; to the contrary, defendant's abandonment of the bag and flight upon their arrival indicated to the district court that he purposefully sought to distance himself from the firearm he knew the bag to contain. App. 5. Separately, the court rejected the argument advanced by counsel at the revocation hearing that someone may have been trying to "set up" defendant by placing a 911 call to report his (purportedly unwitting) firearm possession—calling it "extraordinarily farfetched" in light of the evidence, which the court found rendered it more likely that defendant knew a firearm was inside the bag he carried, set down, and then fled from upon seeing police. App. 7.

Regarding Probation's allegation that defendant violated the rules at the Salvation Army, the district court noted that because that "was admitted . . . there's no need for the Court to delve into that in any great detail," but remarked that his conduct shows "significant drug problems," "is consistent with his criminal history," and reveals "significant disrespect for the rule of law and an inability to abide by conditions of release." App. 9.

Finally, with respect to the events at the MCC, the district court found "that Mr. Harris engaged in that MCC fight" and "was clearly involved in instigating this incident." App. 9-10. The court noted that "there's no evidence that Mr. Harris was responsible for the stabbing itself," but nevertheless found his commission of "battery" to be "disturbing." App. 9-11.

The district court calculated an advisory Guidelines range of 21 to 27 months' imprisonment for defendant's supervised release violations. App. 12. The government noted that, pursuant to 18 U.S.C. § 3583(g), revocation was mandatory because defendant's conduct involved a firearm, and it recommended a within-Guidelines sentence. App. 13. Defense counsel argued that a sentence of time-served, with no supervision to follow, was appropriate. App. 17. Speaking on his own behalf, defendant claimed to be innocent of the firearm charge—insisting that he "didn't know the weapon was in that purse"—but highlighted that he "accepted responsibility for using drugs." App. 23. In explaining why he used drugs at the Salvation Army, defendant stated: "I was kind of weak minded. You know, in situations in life I felt like I could have been a little more stronger, smoke some marijuana, you know, not knowing what they sprayed on it. So yeah, I take full responsibility for that, being weak minded." App. 23. Regarding the incident at the MCC, defendant denied his involvement, noting he "never got convicted" of the incident in any MCC disciplinary proceeding, and contending the government was "blam[ing] this big story [on him]." App. 24.

The district court sentenced defendant to concurrent terms of 36 months' imprisonment for unlawfully possessing a firearm (Violation #1) and 24 months' imprisonment for failing to participate in the Salvation Army's community corrections program by violating its rules (Violation #8). App. 31.

In explaining the sentence, the district judge stressed that defendant was "responsible for what is, in my 11 years on the bench, the most abysmal performance on supervised release of any defendant that's been assigned to my docket." App. 30. The court further emphasized that, "rather than actually accepting responsibility for your conduct, you're still denying your conduct." *Id.* Overall, the court found that defendant's violations—in conjunction with his "MCC fight," "abysmal compliance with location monitoring," and "his prior history of supervised release revocation"—compelled an above-Guidelines sentence, with no additional supervision to follow. App. 29-31.

### C. Analysis

Defendant raises two procedural arguments for the first time on appeal: (1) that the district court should not have accepted defendant's admission, made through counsel, that he violated the Salvation Army's regulations, Br. 22; and (2) that the district court misunderstood the evidence in finding defendant knowingly possessed the firearm contained inside the purse. Br. 25. The district court committed no such errors and, on plain error review, it certainly did not commit an error that was obvious or caused a miscarriage of justice.

1. **The District Court Did Not Err in Accepting Defendant's Waiver.**

"The Supreme Court has made it clear that a defendant is afforded only the minimum requirements of due process at a revocation hearing and that the nature of such a proceeding is informal." *United States v. Pratt*, 52 F.3d 671, 676 (7th Cir. 1995) (citing *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)). Federal Rule of Criminal Procedure 32.1(b)(2) provides that a district court must hold a hearing to decide an alleged violation of supervised release "[u]nless waived by the person." Unlike Rule 11, which governs the procedures attendant to guilty pleas, Rule 32 imposes no requirement that the district court place defendant under oath and address him directly in determining whether he has elected to admit a violation of supervised release and waive a hearing on the matter. *Compare* Rule 11(b)(1), *with* Rule 32.1(b); *see also United States v. Hodges*, 460 F.3d 646, 652 (5th Cir. 2006) (Rule 32 "waivers need not be accompanied either by any magic words or by a formal colloquy of the depth and intensity required under Federal Rule of Criminal Procedure 11."). Instead, the district court is tasked to evaluate "the totality of the circumstances" to determine whether defendant's waiver is knowing and voluntary. *United States v. LeBlanc*, 175 F.3d 511, 517 (7th Cir. 1999).

Here, the totality of the circumstances leaves no serious doubt that defendant knowingly and voluntarily waived his right to contest the allegation

that he violated Salvation Army regulations and was discharged from the program. As outlined above, the evidence of defendant's guilt included the results of two different drug tests, reflecting his use of marijuana, MDMA, and MDA, and defendant had confessed to that drug use to his probation officer. R. 560 at 5-6. At a status hearing on June 28, 2023, the district court expressly told defendant that the allegations against him included "the positive drug tests that were conducted during [his stay at the Salvation Army]," R. 606 at 11, and that only he could make the decision to plead guilty and waive a hearing. *Id.* at 14.

Against that factual backdrop, at the revocation hearing held two weeks later on July 12, 2023, defendant's counsel relayed—in defendant's presence—defendant's decision not to contest the allegation that he failed to comply with Salvation Army requirements, stating explicitly that "Mr. Harris is in a position to admit to . . . coming up positive for marijuana and . . . MDMA, some marijuana that he had smoked . . . . And he was in a restricted or an unauthorized area that he went into at the Salvation Army." R. 604 at 3. Defendant did not object or express disagreement. *See id.* Nor did he speak up when, later in the hearing, government counsel repeated that "Mr. Harris is admitting to the [Salvation Army] violation, which is unlawful use of a controlled substance," *id.* at 7, nor when, two days later, the district court likewise noted that the "Salvation Army conduct . . . was admitted," App. 9. If

there was any doubt as to whether defendant sought to admit or to challenge the allegation that he violated Salvation Army rules, before the district court imposed any punishment, defendant addressed the court directly, stating, "I accepted responsibility for using drugs." App. 23. Defendant then explained that he "smoke[d] some marijuana . . . not knowing what they sprayed on it" because he was "weak minded" at the time. App. 23. He reiterated, "I take full responsibility for that." App. 23. The record is clear that defendant did not desire to contest that he used drugs at the Salvation Army.

Multiple federal courts of appeals have ruled that defendants can admit guilt to a supervised-release violation, and waive an evidentiary hearing on the matter, through counsel. For instance, in *United States v. Tapia-Escalera*, 356 F.3d 183, 182 (1st Cir. 2004), the First Circuit found a knowing and voluntary admission of guilt by the defendant where his attorney told the district court:

> the Court should know that Mr. Tapia is not going to contest the allegations, the violation of failing to report to the probation officers as directed and failing to notify a change of address within 72 hours. That is accepted.

> I've also asked him if it's, in fact, true that he admitted to the probation office that he was using heroin, which he has accepted, and we will not then contest that either.

In denying defendant's claim on appeal that the district court had erred by accepting counsel's representations, the First Circuit explained:

the detailed charges were known, Tapia was told of his procedural rights at the preliminary hearing, defense counsel made clear in Tapia's presence that Tapia did not contest the charges and had admitted drug use, and Tapia made no protest that any of this was unclear or inaccurate. Further, Tapia was not a novice. In addition to his prior criminal history, he had been through a guilty plea proceeding in this very case and had even been through a revocation proceeding for his first violation of release conditions.

*Id.* at 184. The same is all true here.

The Fourth Circuit reached the same result on another analogous set of facts in *United States v. Farrell*, 393 F.3d 498, 500 (4th Cir. 2005), reasoning:

defense counsel explicitly stated, in Farrell's presence, that Farrell admitted to the alleged technical violations, and that the district court could proceed directly to sentencing. . . . When given the opportunity to address the district court directly, Farrell apologized to the court and attempted to explain why she failed to comply with the mental health counseling requirement. At no point during the hearing did Farrell object to her counsel's assertions. It is clear from the totality of the circumstances presented in the record that Farrell understood the allegations against her, that she knowingly and voluntarily admitted to the alleged violations, and that she knowingly and voluntarily waived her right to a full revocation hearing.

*Id.* at 500. With the exception of a single, stray comment in the midst of the revocation hearing (addressed immediately below), the Fourth Circuit—like the First Circuit in *Tapia-Escalera*—may as well have been describing the facts of this case.

Defendant makes much of his interjection—"That's a lie"—spoken during the July 12, 2023 hearing. Br. 22 (referencing R. 604 at 10). But read fairly, the surrounding context makes clear that of the factual allegations read

aloud from the Salvation Army's report—for example, that defendant used a "handmade pulley made from bed linens" to obtain contraband (*see* R. 604 at 9-10)—the one concerning his drug use, which by itself established Violation #8, was never in dispute. Indeed, neither the district court, defense counsel, nor the government interpreted defendant's comment as a claim of innocence to the charge of breaking Salvation Army rules—as none paused to even address the comment. And, as noted, two days later defendant explicitly told the court that he had "accepted responsibility" (past tense) "for using drugs"— an admission of guilt defendant ignores on appeal. App. 23. By contrast, defendant continued to deny that he knew there was a firearm in the purse and that he committed an assault in the MCC, even after the court found him guilty of such acts. App. 23-24. The totality of the circumstances therefore demonstrate that defendant knowingly and voluntarily waived his right to contest that he used controlled substances at the Salvation Army. And because that choice was rational and intentional, it should preclude appellate review. *See Armour*, 804 F.3d at 865 ("[W]e are persuaded that Armour's decision not to challenge the readily-proven facts in the [supervised release] violation memorandum was intentional and supported by a tactical rationale, as these weak arguments could have distracted the court from Armour's stronger arguments objecting to the conditions of his supervised release. Therefore, Armour waived this challenge.").

Even if not waived, the district court did not commit error, and certainly not plain error, in accepting defendant's admission that he broke Salvation Army rules by using controlled substances, as that admission was grounded in multiple positive drug tests, and a confession to his probation officer, that firmly supported a finding of guilt. *See, e.g.*, *United States v. Taylor*, 747 F.3d 516, 519-20 (8th Cir. 2014) (finding no plain error where counsel admitted defendant's guilt because defendant had an opportunity to speak with his attorney and, when defendant was given the opportunity to address the court, he "voiced no objections to his counsel's admission"); *United States v. Fay*, 547 F.3d 1231, 1234 (10th Cir. 2008) (district court did not plainly err in bypassing a revocation hearing where counsel conveyed defendant's guilt, stressing "there is no requirement, as argued by Fay, that the court 'ascertain directly from the Defendant in open court whether he wanted to plead guilty to the allegations of supervised release violations'").

In any event, for the same reasons identified in Section I.B. above, even if the district court had erred in imposing a 24-month sanction for defendant's Salvation Army conduct, defendant was separately sentenced to 36 months' imprisonment for unlawfully possessing a firearm on a separate occasion. For that reason, any error in sentencing defendant for behaving badly at the Salvation Army necessarily was harmless.

### 2. The District Court Did Not Misunderstand the Evidence in Finding that Defendant Knowingly Possessed a Firearm While on Supervised Release.

Contrary to defendant's claim on appeal, the district court did not rely "on an inaccurate understanding of the record" in finding defendant to have unlawfully possessed a firearm. Br. 24. Rather, the court correctly summarized the evidence and gave an exhaustive explanation—spanning seven pages of the transcript—for its finding that defendant knew the purse he carried on video contained the firearm within it, none of which defendant protested or sought to clarify in the district court. *See* App. 2-9.

Chief among its reasons for finding defendant guilty by a preponderance of the evidence, a 911 caller alerted police that a person matching defendant's description had a firearm, indicating to the district court that "the caller had seen a gun placed into that purse," which rendered it "inconceivable that Mr. Harris did not know that as well." App. 3. Consistent with that report, the surveillance video showed that defendant "abandoned the bag as soon as he saw police arriving," from which the court concluded that defendant "knew that there was something in it that he shouldn't have in his possession" App. 4. The court likewise stressed that defendant wore the purse—which it noted was "not large and contained both a firearm and two loaded magazines"—"in a crossbody fashion suggesting that whatever was in the bag needed to be securely held." App. 6. Moreover, the court stressed that, given his relationship

to the purse's owner, "it's hard to imagine that Mr. Harris . . . didn't know . . . that there was a gun in the purse." App. 6.

The district court could have stopped there in reaching its well-supported conclusion that "it's more likely than not that Mr. Harris knew that there was a gun in the purse." App. 7. But it went further to explain why each of the countervailing claims were unpersuasive—both those offered by defendant to police when he was arrested and the one argued by his state trial counsel. In contrast to defendant's argument on appeal that the district court conflated the two (Br. 25), the court explicitly identified the argument that defendant ran because "there was a warrant out for his arrest" as *the defense that was offered at the trial*." App. 4. After rejecting it, the court *then* addressed the shifting story that defendant himself offered to police—namely, that he was selling "weed" and possessed an ecstasy pill, both of which the surveillance video refuted. *See* App. 4-6 ("Next we have Mr. Harris's inconsistent statements about why he ran which all combine as well to undermine his credibility."). Although the district court then addressed for a second time "the argument that [defendant] ran because there was an arrest warrant," the transcript does not support a claim that the court was confused about the source of that supposition. *See* App. 5.

But even if it had been, that error would be harmless, as the court's description of the evidence establishing defendant's guilt by a preponderance

makes apparent that the source of defendant's warrant-related claim did not influence its finding. *Cf. United States v. Medrano*, 83 F.4th 1073, 1077 (7th Cir. 2023) ("We will affirm if the error had no substantial influence on the verdict because other untainted incriminating evidence is overwhelming.") (cleaned up).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that defendant's convictions and sentence be affirmed.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

THOMAS P. PEABODY
Assistant United States Attorney

*/s/ Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

# RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 10,274 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     */s/ Brian J. Kerwin*
        BRIAN J. KERWIN
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois
        (312) 886-1328

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:    */s/ Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-1328